[No. B173022. Second Dist., Div. Eight. June 27, 2006.]

AGNETA KARLSSON et al., Plaintiffs and Respondents, v.
FORD MOTOR COMPANY, Defendant and Appellant.

**COUNSEL**

Shook, Hardy & Bacon, Frank P. Kelly III; Lewis, Brisbois, Bisgaard & Smith, Steven R. Lewis; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., William E. Thomson and J. Christopher Jennings for Defendant and Appellant.

Martin N. Buchanan; Esner & Chang, Stuart B. Esner; Girardi & Keese, Thomas V. Girardi, Howard B. Miller, David R. Lira; Law Offices of Marvin Kay and Marvin Kay for Plaintiffs and Respondents.

## OPINION

**RUBIN, J.**—Defendant Ford Motor Company (Ford) appeals from the judgment entered after a jury verdict in this product liability action awarded plaintiff Johan Karlsson more than $30 million in compensatory and punitive damages. We hold that evidence and issue preclusion sanctions that were ordered against Ford for various discovery violations were properly imposed before trial. We also hold that those sanctions were, for the most part, properly applied during the trial in the form of jury instructions, evidentiary rulings, and plaintiff's jury arguments, and that any errors by the court were harmless. We also conclude that, because the court imposed discovery sanctions after it had summarily adjudicated plaintiff's punitive damages claims in Ford's favor, the court was entitled to reconsider and vacate its summary adjudication order. The court also did not err when it imposed lesser sanctions against plaintiff for failing to preserve certain evidence. We next hold the court correctly denied Ford's new trial motion based on allegations of juror misconduct. Finally, plaintiff's claims were not preempted by federal seat belt regulations because Ford waived the issue. We therefore affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

On November 22, 1996, five-year-old Johan Karlsson (Johan) had his spine broken and became a paraplegic when the 1996 Ford Windstar minivan in which he was riding struck a 15-ton steel coil that fell off the back of a tractor trailer and into the middle of Interstate 5. The accident happened when the driver of that tractor trailer dozed off and rear-ended a truck in front of him. Also in the van with Johan were his mother, uncle, and four siblings (the Karlssons). The Karlssons and Johan sued the somnolent truck driver and his employer, TransContinental Transport (TCT).

The Windstar van had three rows of seating, and provided combination lap belt and shoulder harnesses for all of the seats but one—the center seat of the rear, third row bench, where Johan was seated. Instead of the so-called three-point harness worn by the others, Johan was provided only a lap belt. While everyone else in the van was also injured, their injuries were less severe and all six of them made full recoveries. Johan's spinal injuries were consistent with something physicians call seat belt syndrome, when a passenger restrained by only a lap belt jackknifes over at the waist due to the force of the

collision. Had Johan been wearing a three-point restraint, his injuries would have been no more severe than the other occupants of the Windstar. Johan's mother testified that she adjusted Johan's lap belt for him before starting their trip, making sure it fit snugly and rested low on his hips.

TCT cross-complained against Ford for indemnity, alleging that the van had been negligently designed, thereby contributing to Johan's injuries. The Karlssons and Johan eventually added Ford as a defendant to their action on two product liability theories—that the van had a design defect and that Ford failed to warn of known dangers associated with the use of the lap belt.

Johan and the Karlssons settled with TCT in exchange for $10 million and TCT's assistance in litigating the case against Ford. When the case eventually went to trial seven years later in September 2003, Johan was the only plaintiff and Ford was the only defendant. A jury found for Johan on both of his product liability theories and awarded him $10.45 million in economic damages, $20 million for pain and suffering, and $15 million in punitive damages. The parties stipulated to reduce the total verdict to $30,341,636.50 based on findings of comparative fault by TCT and the amount of the earlier TCT settlement. (Code Civ. Proc., § 877; Civ. Code, § 1431.2.)

The issues on appeal concern numerous rulings by the court before, during, and after the trial. Before trial, Ford was the subject of several discovery motions filed by Johan and TCT. As a result of the fifth such motion, the trial court imposed issue and evidence preclusion sanctions against Ford on the issues of warnings and the technical feasibility of a safer, alternative seat belt design, as well as on an attempt by Ford to conceal certain evidence during discovery. These sanctions were presented to the jury by way of jury instructions, formed the basis for some of Johan's witness examinations and jury arguments, and were used to limit the evidence Ford could present on its behalf. As a result of the sanctions ruling, the trial court also vacated its earlier summary adjudication order striking Johan's punitive damages claim, allowing the jury to reach the issue at trial. Ford in turn sought evidence sanctions against Johan, claiming he had lost a key piece of evidence: the rear bench seat of the Karlssons' Windstar. Ford was allowed to present evidence and make argument on that issue, and a general instruction on concealing evidence was given to the jury. During jury deliberations, one juror made comments to the others about having seen a new model Windstar that did not correct the absence of a three-point belt in the center rear seat, and about having seen such belts in the mid-bench seat of another Ford vehicle. Those statements prompted an unsuccessful new trial motion based on juror misconduct.

On appeal, Ford contends that the discovery sanctions were not warranted and were excessive, and that the scope of those sanctions was improperly expanded during trial by virtue of comments by the court, the argument of Johan's counsel, various evidentiary rulings, and certain related jury instructions. Ford also contends that the trial court erred by: reinstating Johan's punitive damages claim based on the discovery sanctions; allowing Johan to argue that Ford's discovery abuses were grounds for awarding punitive damages; failing to sanction Johan because he did not preserve the rear bench seat of his parents' minivan; and by failing to order a new trial for jury misconduct. Ford also contends, for the first time on appeal, that Johan's claims are preempted by federal seat belt regulations.

## BACKGROUND OF THE DISCOVERY SANCTIONS

### 1. *Product Liability Theories Applicable at Trial*

■ Under California law, there are three ways to hold a manufacturer strictly liable for injuries caused by its product: (1) if the product is defectively manufactured; (2) if it is defectively designed; or (3) if it is distributed without sufficient warnings or instructions about its potential for harm. (*Arnold v. Dow Chemical Co.* (2001) 91 Cal.App.4th 698, 715 [110 Cal.Rptr.2d 722].) A product is defectively *manufactured* if it contains some unintended flaw. (*In re Coordinated Latex Glove Litigation* (2002) 99 Cal.App.4th 594, 606 [121 Cal.Rptr.2d 301].) There are two tests for establishing a *design defect*: (1) under the consumer expectations test, if the plaintiff shows that the product failed to perform as safely as an ordinary consumer would expect when using the product in an intended or reasonably foreseeable manner; and (2) under the risk-benefit test, where the trier of fact is asked to balance the risk of danger inherent in the challenged design versus the feasibility of a safer design, the gravity of the danger, and the adverse consequences to the product of a safer design. (*Arnold,* at p. 715.) A determination of the risk-benefit issue involves "technical issues of feasibility, cost, practicality, risk, and benefit [citation] which are 'impossible' to avoid [citation]." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 567 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*).) In *failure to warn* cases, a flawlessly designed or manufactured product becomes defective if the manufacturer fails to warn of the product's dangerous propensities. (*Finn v. G. D. Searle & Co.* (1984) 35 Cal.3d 691, 699-700 [200 Cal.Rptr. 870, 677 P.2d 1147].)

The jury in this case was instructed on the theories of: (1) design defect under the risk-benefit approach; and (2) failure to warn. Under the design defect theory, Johan argued to the jury that Ford could have and should have installed a seat belt in the rear bench center seat that included some type of shoulder harness. Under the failure to warn theory, Johan argued to the jury

that Ford did not adequately warn of the need to wear the lap belt properly, or of the magnitude of the harm that might follow as a result. Ford's primary defense was that the collision was a severe one and that Johan's seat belt was not properly adjusted. Ford also contended that at the time it manufactured the Karlssons' Windstar, it was not feasible to install a three-point restraint system in the rear bench center seat.

## 2. *The Discovery Sanctions*

Early on in the case, Retired Judge Thomas F. Nuss was appointed as the discovery referee. He issued several reports concerning discovery disputes among the parties, which were then adopted by the trial court, albeit with some modifications. At issue here are several sanctions imposed by the court as a result of Judge Nuss's fifth interim report.[1]

The fifth report was issued in April 2003 in response to a motion for discovery sanctions brought by TCT because Ford had supposedly given discovery responses that were both deceptive and dilatory. Because the referee's findings are not disputed, we will set forth those findings in lieu of summarizing the parties' moving and opposition briefs:

(1) The referee found that after being ordered to meet and confer regarding three-point restraint prototypes, Ford agreed in July 2001 to produce documents, photos, and prototypes. Instead of doing so, Ford produced a witness who stated that he believed all prototypes had been destroyed. Because the agreement was reached as part of a court-ordered meet-and-confer session, the referee concluded that Ford had violated a court order.

(2) Following another meet-and-confer session, Ford promised to produce for deposition its person most knowledgeable (PMK) to "talk about warnings," including a PMK on the issue of why booster seat warnings were included in the owner's manual of 1996 Ford Aerostar minivans, but not in the manual for the 1996 Windstar.[2] Despite Ford's promise, it produced several witnesses who were unable to answer fully TCT's deposition questions. Even though TCT sought this information for more than two years, it was "thwarted by the inaction and actions of Ford."

---

[1] With limited exceptions that we discuss, *post,* Ford's opening brief does not argue that the referee's findings adopted by the trial court were not supported by the facts, and does not argue that we should reject those factual findings. In its reply brief, however, Ford does claim that some of the sanctions were not supported by the evidence. Because Ford did not raise the issue until its reply, the argument is waived. (*Reed v. Mutual Service Corp.* (2003) 106 Cal.App.4th 1359, 1372, fn. 11 [131 Cal.Rptr.2d 524].) Accordingly, we accept as true the version of events recounted in the referee's fifth report.

[2] During the discovery phase of litigation, lap belt warnings were in issue both generally and in regard to their use with booster seats. As discussed in more detail in footnote 7, *post,* the booster seat issue was later dropped.

(3) As far back as 2000, Ford stated that all the documents requested by TCT were contained in Ford's rear belt reading room in Dearborn, Michigan. Just four months before trial, however, a paralegal working for TCT discovered numerous responsive documents in Ford's nearby *passive restraint* reading room while working on another case. The referee noted that Ford did not contest the allegation or submit any evidence in opposition, leading him to conclude that Ford admitted the charge. Referring to his earlier, second report concerning Ford's discovery responses, the referee said that Ford continued to provide responses that were neither straightforward nor unambiguous.

(4) At no time during any of the ongoing discovery disputes did Ford provide a declaration identifying what documents were located in the rear seat belt or passive restraint reading rooms. Some 20 months after being ordered to produce documents as they were kept in the ordinary course of business, Ford had failed to do so, contributing to TCT's requests for numerous witnesses. The referee found that Ford's failure was either intentional or the result of providing insufficient resources to get the job done. Regardless of the reason, the result was the same—continual delay until Ford announced it would produce no more documents or witnesses, at a time when no more discovery motions could be brought and trial was imminent. According to the referee, "[t]his pattern of discovery abuse has previously been condemned by the Courts and relief granted through appropriate evidentiary orders."[3]

(5) Ford had evaded discovery by providing TCT with too many documents, and without proper itemization, in order to overwhelm TCT with written material.

(6) Only in the previous six months had Ford disclosed the name of the employee who could have truly served as the PMK on the warnings issue. That person no longer worked for Ford, and it was unclear whether TCT could have located him and obtained an out-of-state commission for his

---

[3] Ford contended during oral argument that Johan gained access to the documents in the passive restraint reading room early on in the course of the litigation, suggesting that Johan had ample time to review those documents and cure any resulting prejudice. The record shows that the documents were discovered on March 20, 2002, just two months before TCT brought the discovery motion that led to the referee's fifth report and the sanctions in question. If Ford means to challenge the referee's finding that the result of Ford's conduct was to delay matters until no more discovery motions could be brought, as noted in footnote 1, *ante,* Ford has failed to meet its burden of articulating the point through discussion, analysis, citation to authority, and citation to the record. If Ford means to suggest that Johan was not prejudiced by the delay in turning over the documents, it failed to meet its burden by pointing us to any of the documents found in the passive restraint room and showing that Johan either had access to the same evidence from other sources, or that the evidence was of little or no relevance to his case. We, therefore, deem the argument waived.

deposition. However, his identity should have been disclosed much sooner. Instead, TCT continued to depose Ford's other warnings witnesses. Ford also delayed for 12 months before disclosing the identity of another witness on pertinent warnings. That delay was not explained. The referee found that "these actions and inactions by Ford or its counsel all pertain to important issues in the case, and violated the Court's previous Order to provide timely discovery and are a misuse of the discovery process. The referee finds Ford or its counsel failed to act in good faith in producing the appropriate witness or witnesses on the warnings issue (which Ford had agreed to produce) and that Ford or its counsel with reasonable diligence could have produced the witnesses or made their identity known so TCT would have the opportunity to utilize the appropriate statutes to obtain the depositions."

(7) Despite having agreed to produce three-point belt system prototypes, and related photos and documents, Ford instead produced a witness who said that the prototypes had probably been destroyed by Ford's outside prototype supplier, that any documents would have been with the supplier as well, and that any documents in Ford's possession would have been destroyed long before discovery requests were made in this case. Because Ford did not provide accurate information until after discovery had closed, TCT was unable to obtain the documents or prototypes from the supplier. The referee found that Ford failed to act with reasonable diligence, and did not act in good faith, disobeying both previous discovery orders and its meet-and-confer agreement with opposing counsel.

(8) When one Ford employee took ill during her deposition, TCT agreed to depose another witness, but did not cancel the deposition of the first witness and asked for proof that the latter was too ill to conclude her deposition. Ford never provided such documentation. Ford also delayed in providing TCT's counsel with a federal transportation safety report that TCT needed for the depositions until it was too late for TCT to complete its examination. The referee found that this incident was not willful.

Based on these findings, the referee recommended that the trial court impose the following eight sanctions:

"1. That Ford shall not be able to present any evidence that Ford warned Plaintiff that the center rear two-point seatbelt was or was not a dangerous condition;

"2. That Plaintiff and TCT are entitled to a jury instruction that the center rear two-point seatbelt did not provide adequate protection to Plaintiff and Ford failed to warn Plaintiff of this dangerous condition;

"3. That Ford is not allowed to provide evidence that Ford's management was not aware of this failure to warn;

"4. That Ford shall not be able to present any evidence that it was not technically feasible for Ford to develop an integrated three-point belt system in the 1996 Windstar;

"5. That Plaintiff and TCT are entitled to a jury instruction that Ford could have equipped the 1996 Windstar with a three-point belt system compatible with a booster seat;

"6. That Ford shall not be allowed to provide any evidence that Ford's management was not aware that a three-point belt system was technically feasible for the rear center seat in a 1996 Windstar;

"7. That Ford shall not be able to object to any documents, films, test reports, or any other evidence that was obtained by Plaintiffs or TCT from the Rear Belt Reading Room and the Passive Restraint Reading Room from being allowed into evidence at trial;

"8. That Ford shall not be allowed to provide any evidence that Ford's management was not aware of this documentation."

In April 2003, after considering Ford's written objections to these findings, the trial court adopted them and imposed the sanctions the referee had recommended. Ford then brought a petition for writ relief to this court, contending that the sanctions were not supported by the evidence, that Ford had violated no court orders, which it asserted was a prerequisite to imposing sanctions, and that even if sanctions were warranted, those imposed by the court were out of proportion to the discovery abuses.

On July 31, 2003, we issued a *Palma*[4] notice, indicating that we believed sanction Nos. 4 and 5 relating to evidence and instructions on the technical feasibility issue appeared to be excessive. We also stated that the other sanctions, while severe, appeared appropriate in terms of the findings on Ford's discovery misconduct. We said we intended to issue a peremptory writ in the first instance unless the trial court vacated sanction Nos. 4 and 5, but indicated that the trial court was free to fashion lesser sanctions. On August 1, 2003, the trial court vacated sanction Nos. 4 and 5 and set a hearing for August 15 to address the issue of lesser sanctions. We therefore deemed the

---

[4] *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 180 [203 Cal.Rptr. 626, 681 P.2d 893].

matter moot and denied the petition. At the August 15 hearing, the court decided to replace sanction Nos. 4 and 5 with special instruction No. 1, which told the jury: "The Court has found that Ford Motor Company attempted to conceal evidence in order to prevent its being used in this trial. You may consider that fact in determining what inferences to draw from the evidence in this case concerning the issue of the technical feasibility of Ford Motor Company in developing and equipping the 1996 Windstar with various three point belt systems."

### 3. *The Scope of the Discovery Sanctions*

When the discovery sanctions were first imposed in April 2003, the court appeared unsure about their effect on the issues to be tried. Asked by Ford's lawyer whether the sanctions precluded any possible defenses to the claims, the court replied that it expected to see a motion for a directed verdict, but was unsure how it would rule and agreed to resolve it sometime in August 2003 after the issue was briefed by the parties. At the August 15, 2003, hearing where the lesser sanction on technical feasibility was imposed, the court set a hearing for August 25 on various motions in limine, including one to determine what issues were left for the jury to decide in light of the discovery sanctions. On August 26, 2003, after a hearing on the issues, the court determined that its discovery sanctions left the following issues for the jury's consideration: (1) under the design defect theory, whether a three-point shoulder harness restraint was technically feasible; (2) under both the design defect and failure to warn theories, whether the lap belt caused or increased the extent of Johan's injuries; (3) the nature and extent of damages; (4) the negligence of third parties and the apportionment of fault; (5) whether Ford's conduct merited an award of punitive damages; and (6) if so, the amount of punitive damages.

Pursuant to the revised, lesser sanction that the trial court substituted for original sanction Nos. 4 and 5, the court gave special instruction No. 1, which told the jury that Ford had tried to conceal evidence and allowed the jury to consider that fact when drawing inferences from the evidence on the technical feasibility issue. Pursuant to discovery sanction No. 2, the jury was given special instruction No. 4, which said: "It has been determined that the center rear two-point seatbelt as it existed in the 1996 Ford Windstar did not provide adequate protection to Plaintiff . . . and [Ford] failed to warn Plaintiff of this dangerous condition."

## DISCUSSION

1. *The Discovery Sanctions Were Properly Imposed Pretrial and Properly Applied at Trial*

 A. *Violation of a Discovery Order Was Not a Prerequisite to the Impositions of Sanctions*

■ Misuse of the discovery process may result in the imposition of a variety of sanctions. These include payment of costs, sanctions barring the introduction of certain evidence, sanctions deeming that certain issues are determined against the offending party, and sanctions terminating an action in favor of the aggrieved party. (Code Civ. Proc., §§ 2023.020, 2023.030.) Misuse of the discovery process includes failing to respond or submit to authorized discovery, providing evasive discovery responses, disobeying a court order to provide discovery, unsuccessfully making or opposing discovery motions without substantial justification, and failing to meet and confer in good faith to resolve a discovery dispute when required by statute to do so. (Code Civ. Proc., § 2023.010, subds. (d)–(i).) The court may impose sanctions "[t]o the extent authorized by the chapter governing any particular discovery method or any other provision of this title . . . ." (Code Civ. Proc., § 2023.030.)

■ The discovery sanctions at issue here were imposed in connection with deposition notices and document production requests. Pursuant to the statutes governing both methods of discovery, evidence and issue preclusion sanctions may be imposed only after a motion to compel is made and granted and the party to be sanctioned has failed to comply with that order. (Code Civ. Proc., §§ 2025.480, subds. (f), (g), 2031.310, subds. (d), (e).) Ford contends that the first three sanctions were based on its failure to properly and timely designate for deposition a PMK on the warnings issue as it related to the need for and use of booster seats. Because Ford's agreement concerning the designation of a PMK on the booster seat issue arose from a court-ordered meet-and-confer session, but was not the result of an order following a motion to compel, Ford contends the first three sanctions should not have been imposed.

Ford is wrong for two reasons: First, by contending that sanction Nos. 1, 2, and 3 were based solely on the warnings PMK; and second, by ignoring in its opening brief that the referee's report and the trial court's sanctions order were based on a pattern of discovery abuse that effectively led to the loss of various items of evidence. Decisions such as *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1544–1549 [51 Cal.Rptr.2d 311] (*Vallbona*), and *Do It Urself Moving & Storage, Inc. v. Brown, Leifer, Slatkin & Berns* (1992) 7

Cal.App.4th 27, 35 [9 Cal.Rptr.2d 396] (*Do It Urself*) have held that violation of a discovery order is not a prerequisite to issue and evidentiary sanctions when the offending party has engaged in a pattern of willful discovery abuse that causes the unavailability of evidence. (See also *Maldonado v. Superior Court* (2002) 94 Cal.App.4th 1390, 1399 [115 Cal.Rptr.2d 137].)[5]

TCT's discovery motion argued that the first three sanctions were warranted not just because of Ford's failure to designate a proper warnings PMK, but because of several other discovery abuses as well, including Ford's failure to produce drawings and prototypes of three-point belt systems, its concealment of relevant documents in the passive restraint reading room, its concealment of an existing four-point belt system, and its failure to produce a Ford employee to conclude her deposition. The referee's fifth report noted and discussed those arguments in collective fashion. The referee found that Ford's conduct amounted to a "pattern of discovery abuse," and that Ford had both violated court orders and had misused the discovery process. Although factually dissimilar to *Vallbona* and *Do It Urself,* the result of Ford's conduct was the same. Because the discovery cutoff had passed, and because trial was imminent, TCT and Johan lost the opportunity to explore fully any leads obtained from discovery that should have been produced. This included discovery that might have been prompted by the four documents in the passive restraint reading room. Evidence, thus, was not available to those parties. Lesser sanctions would have been futile because Ford no longer had the legal capability to correct its earlier abuses.

Based on the entirety of his findings, the referee recommended the eight original sanctions. Nowhere did his fifth report differentiate between the several grounds raised by TCT or otherwise indicate that sanction Nos. 1, 2, and 3 were based solely on the failure to designate a proper warnings PMK. At the

---

[5] The plaintiffs in *Vallbona* sued a physician for fraud after undergoing laser treatment to remove cellulite. The defendant claimed his machine had been approved by the Food and Drug Administration (FDA). In January 1992, the plaintiffs sought discovery on that issue and others. In April 1992, defense counsel responded informally, providing copies of some responsive documents, while stating that the defendant did not have the other requested material. No documents on FDA approval were provided. The defendant was deposed in September 2002, one year before trial. He said he once had FDA-related documents, had declined to produce them earlier for no particular reason, and said they had been stolen in May 1992. When the trial began, the defendant brought to trial documents on the FDA approval, and the plaintiffs were awarded evidence and issue sanctions establishing that the defendant never sought FDA approval for his laser removal device. Even though the defendant had violated no court order compelling him to produce the documents, the appellate court affirmed, because obtaining a motion to compel at an earlier time would have been futile, based on the defendant's claim that the documents had been stolen. (*Vallbona, supra,* 43 Cal.App.4th at pp. 1544–1549.) Evidence sanctions were approved in *Do It Urself,* in the absence of a previous order compelling discovery, where the defendant delayed trial promising to supply an audit, then admitted that it could not perform the audit. (*Do It Urself, supra,* 7 Cal.App.4th at p. 35.)

hearing where the trial court considered Ford's objections to the referee's report and adopted the referee's findings, the court rejected Ford's contention that sanctions were improper because Ford had not violated a discovery order. Expressly citing to *Do It Urself, supra,* 7 Cal.App.4th 27, the court found that the meet-and-confer violation over the warnings PMK was "part and parcel of a whole history of stonewalling, wild goose chases, too little, too late . . ." Noting that Ford had violated some discovery orders, the trial court found that the warnings PMK incident "was the last straw in a series of violations that kept on continuing and continuing and continuing . . . ." It is apparent the trial court found that Ford's discovery violations went far beyond the warnings PMK.

Ford's opening brief does not address these matters. Instead, as noted above, Ford contends that sanction Nos. 1, 2 and 3 were based solely on the warnings PMK issue and makes no mention of the trial court's reference to the *Do It Urself* case or its findings that sanctions were warranted based on a pattern of discovery abuse. Only after Johan pointed this out in his respondent's brief did Ford acknowledge the issue, contending in its reply that the pattern of discovery abuse issue was not raised in TCT's original moving papers and was therefore waived. We disagree. As discussed above, the issue was, at a minimum, implied in TCT's moving papers, which lumped together the warnings PMK issue with several other discovery abuses and violations of court orders by Ford. Ford's opposition memorandum raised the issue, arguing that it had violated no court orders. The referee's report considered together the collective discovery abuses and violations of court orders raised by TCT. Even though the referee believed Ford violated a court order on the warnings PMK issue because Ford's misconduct arose from a court-ordered meet-and-confer session, the referee's sanctions recommendations were based on findings that Ford both violated court orders and committed widespread, recurring discovery abuse. Finally, the trial court expressly based its findings and order on the pattern of abuse theory, citing the *Do It Urself* case as authority. At no time did Ford object that a new issue had been raised, and instead continued to defend itself on the merits at the hearing. On this record, we hold that the issue was properly raised below, and that the trial court reasonably exercised its discretion in imposing sanctions for an abusive discovery pattern that resulted in the loss of evidence.

Ford's opening brief raised the factual issue whether the sanctions were based only on the booster seat lap belt warnings PMK issue (as opposed to the issue of lap belt warnings generally). However, Ford did not raise as part of its argument any substantial evidence challenges to any of the referee's other findings concerning the historical facts, the effect of Ford's discovery conduct, or any of the other circumstances relied upon when recommending sanctions. For the first time in its reply brief, Ford tried to do so. Because it

waited until then to raise those issues, we deem them waived. (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 [13 Cal.Rptr.2d 432].)

## B. *The First Three Sanctions Were Not Excessive*

■ Discovery sanctions must be tailored in order to remedy the offending party's discovery abuse, should not give the aggrieved party more than what it is entitled to, and should not be used to punish the offending party. We review the trial court's order under the deferential abuse of discretion standard. (*Do It Urself, supra,* 7 Cal.App.4th at p. 35.)[6] Ford contends that sanction Nos. 1, 2, and 3 were based solely on its failure to supply for deposition an appropriate PMK on the issue of warnings as to seat belt use for booster seats. Because the booster seat issue was eliminated before trial, and because it was undisputed that the Windstar owner's manual included some lap belt use warnings other than for booster seat use, Ford argues that sanction Nos. 1, 2, and 3 were excessive and went beyond remedying its discovery abuse.[7]

The first three sanctions precluded Ford from introducing evidence that Ford warned Johan that the two-point lap belt was or was not a dangerous condition and that Ford was unaware of its failure to warn, and stated that Johan was entitled to an instruction that the lap belt did not provide adequate protection and Ford failed to warn of that dangerous condition. As discussed above, these sanctions were based not only on the PMK issue, but also on a pattern of misconduct by Ford that led the referee and the court to find a persistent pattern of discovery abuse. Even if the record is not as clear on this point as we believe it to be, it is, at a minimum, silent on that point. Ford bears the burden of affirmatively demonstrating error. Under well-established rules of appellate procedure, we presume the court's order is correct and indulge all presumptions and intendments in its favor on matters as to which the record is silent. (*Do It Urself, supra,* 7 Cal.App.4th at p. 35.) Because Ford has not acknowledged or addressed that the sanctions were based on its history of misconduct, we deem it waived. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699–700 [46 Cal.Rptr.2d 119] (*Landry*).)

---

[6] That we previously denied writ relief on this subject does not preclude us from revisiting it on appeal. (*Gammoh v. City of Anaheim* (1999) 73 Cal.App.4th 186, 195–196 [86 Cal.Rptr.2d 194].)

[7] Part of Johan's failure to warn claim was based on the contention that Ford did not include booster seat warnings in the Windstar owner's manual. Johan's mother came from Sweden, which apparently has different laws concerning booster seat requirements and warnings, and Johan moved in limine to exclude any references to his mother's knowledge about the Swedish requirements. The court granted that motion. Although the parties do not explain it well and the record is less than clear, it appears that because a booster seat could not have been used in Johan's seat that the issue of booster seat warnings was deemed irrelevant and was removed from the case.

We alternatively affirm on the merits. Despite Ford's claim that its discovery violations concerned no more than the designation of a PMK for deposition on the booster seat warnings issue, the record contains evidence to the contrary. Although the referee's fifth report states that Ford had thwarted TCT's two-year effort to depose a PMK on the issue of booster seat warnings, nowhere else in the report does the referee limit his discussion to the booster seat issue. Instead, the report refers to Ford's failure to produce a PMK "on seatbelt restraint warnings; warnings contained in Windstar and similar vehicle User Guides," and to Ford's promise to produce witnesses " 'to talk about warnings.' " When discussing Ford's obligations to produce a PMK witness on warnings, the referee cited to three pages from the transcript of the court-ordered meet-and-confer session where the parties hammered out the scope of TCT's deposition notice on that issue. Those pages of the transcript show Ford's counsel agreeing to produce somebody to talk about "warnings on the Windstar, the warnings that are contained therein, the warnings that are . . . in the owner's guide and would be generally familiar with warnings on the Aerostar, another vehicle that was mentioned in this discussion."

After that meet-and-confer session ended, TCT sent out a notice for the deposition of Ford's PMK concerning records, reports, photos, and all other documents "related to Ford Windstar and similar vehicle belt restraints, child seat and seating, and similar device warnings, including but not limited to owner manuals, brochures, dealership materials, notices, vehicle placards," and other items. Ford objected to that notice, but only because the parties had not agreed to mutually convenient dates for the depositions. In a February 7, 2002, letter from Ford's lawyer to TCT's lawyer, the Ford lawyer confirmed that an agreement had been reached for the deposition date, at which time Ford "will produce someone on the topic of manuals." Finally, the record shows that the several warnings witnesses Ford did produce—who were later deemed to be insufficient—testified to matters such as the existence of alternative restraint systems. Taken as a whole, this evidence does not show that the warnings PMK issue was limited exclusively to the booster seat issue, and instead encompassed the issue of warnings in general. At a minimum, it raises a strong inference to that effect. The referee's report suggested that Ford's unexplained delay in identifying the true warnings PMK prevented TCT from utilizing the proper discovery methods to obtain that person's deposition testimony.

As we have already observed, the argument portions of Ford's opening brief did not contest these findings or their factual underpinnings, meaning that their validity has been deemed conceded.[8] Given the referee's and trial court's findings, the court did not abuse its discretion in imposing the

---

[8] See footnote 1, *ante.*

sanctions ordered. In essence, the referee and the trial court found, among other things, a failure by Ford to produce for deposition the person or persons best suited to testify about the issue of what seat belt warnings were given to Windstar buyers such as the Karlssons, including Ford's knowledge of the need for warnings, and why only certain warnings were given. The referee found that Ford's conduct in this regard was not in good faith. The referee also found that Ford did not act in good faith when it provided inadequate and incomplete information regarding the issue of three-point restraint system prototypes, and failed to disclose the existence of documents in its passive restraint reading room. Because the persistent refusal to comply with discovery requests is equated with an admission that the disobedient party has no meritorious claim in regard to that issue, the appropriate sanction for such conduct is preclusion of that evidence from trial, even if that proves determinative in terminating the offending party's case. (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 390 [97 Cal.Rptr.2d 12] [plaintiff in sex molestation civil action refused to answer discovery concerning facts, evidence, and witnesses to support his claim]; *Kuhns v. State of California* (1992) 8 Cal.App.4th 982, 989 [10 Cal.Rptr.2d 773] (*Kuhns*) [state was sued for injuries caused by dangerous road condition; state's failure to produce information relevant to plaintiff's claim of the dangerous condition of the property, including state's notice of that fact, justified issue sanction deeming it admitted that the roadway was a dangerous condition of which the state had prior knowledge].)

Finally, Ford contends that the first three sanctions were excessive because the Windstar's owner's manual did include warnings about seat belt use and the increased risks to children from improper adjustment of the lap belt.[9] According to Ford, the effect of the sanctions, particularly No. 2, which told the jury that no warnings had been given, was to forbid the jury from considering the propriety of the warnings contained in the owner's manual. This argument has surface appeal. After all, if the owner's manual included some warnings about proper seat belt use and the risks involved from their improper use, it seems unfair to instruct the jury that, as a matter of law, no warnings were given. Given the nature of Ford's discovery violations, however, we believe the sanctions were still warranted despite the warnings in the owner's manual. In *Kuhns, supra,* 8 Cal.App.4th 982, the plaintiff was injured when a truck tipped over on a curving highway transition road. The state's failure to produce evidence concerning its knowledge that a certain road condition was hazardous led to an issue preclusion sanction deeming it admitted that the roadway was dangerous and that the state knew about that

---

[9] The owner's manual, which was in evidence, warned that lap belts had to be worn snugly and as low around the hips as possible to avoid increasing the risk of personal injury. The manual also warned that if seat belts were not properly worn and adjusted, the risk of serious injury to a child would be much greater.

fact. The state was also precluded from defending itself on the theory that it gave a reasonable warning of the hazard by its placement of a road sign with the number 30 on it, which also depicted a truck tipping over. On appeal, the court held that the defense was so interwoven with the discovery violations that it too was precluded: "As the trial court pointed out in denying [the state's] motion for new trial, [state's] failure to produce [certain] studies interfered with [plaintiff's] ability to prove what [state] knew, and for how long, about the comfortable safe speed."[10] (*Id.* at p. 991.) Because Ford prevented TCT from conducting discovery about the warnings issue, no one will ever know what other documents or information Ford had in its possession concerning its knowledge that the lap belts were dangerous or that different warnings apart from those in the owner's manual were required. (See *Estate of Ivey* (1994) 22 Cal.App.4th 873, 878–879 [28 Cal.Rptr.2d 16] [beneficiary of testamentary trust filed objections to trustee's accounting and tried to justify late raising of claim on grounds of extrinsic fraud because she had no notice of the proceedings; failure to produce documents concerning beneficiary's dealings with the executor were relevant on that issue and the failure to do so meant the trustee would never know what documents in beneficiary's possession would show notice of the proceedings].) Accordingly, the first three sanctions were proper, even though there was evidence available that was factually inconsistent with the sanctions.[11]

### C. *Sanction No. 2 Was Properly Used at Trial*

Pursuant to sanction No. 2, the court instructed the jury with special instruction No. 2 that the Windstar's lap belt "did not provide [Johan] adequate protection" and that Ford did not warn Johan "of this dangerous condition." On its face, this instruction does not implicate Johan's design defect cause of action and is limited only to Ford's alleged failure to warn. Ford contends, however, that the sanction was improperly expanded at trial into the equivalent of a directed verdict on the design defect theory. Through a combination of improper comments by the court and opposing counsel, limitations on the evidence Ford was permitted to introduce, and improper closing argument by Johan's lawyer, Ford contends the jury was told that the instruction amounted to a finding that the Windstar was defectively designed,

---

[10] The court also noted that the plaintiff relied on the sanction when deciding to forgo certain deposition questions. (*Kuhns, supra,* 8 Cal.App.4th at p. 991.)

[11] It is often the case that evidentiary and issue sanctions leave the jury with a misimpression as to some actual facts by effectively removing from the jury's consideration evidence favorable to the offending party's position, or by deeming issues in favor of the aggrieved party even though the offending party has strong evidence to the contrary. Such is the natural consequence of serious discovery violations. Here, Ford benefited from the fact that despite the sanctions, the trial court did not excise the warnings contained in the Windstar owner's manual.

thereby removing from the jury's consideration the technical feasibility component of a design defect claim.

Ford complains about the following comments:

(1) During plaintiff's opening statement, in reference to whether or not the Windstar provided Johan with adequate crash protection, his lawyer read the instruction to the jury and said, "That's it. It's over with in terms of that issue. So I indicated before that the evidence in this case would show that under the law, we're entitled to . . . win. We start with this and that's going to come from the court";

(2) When Johan's counsel was cross-examining Ford's expert witness, counsel asked whether it was true that the lap belt had already been found to be defective, prompting an objection from Ford's lawyer. The trial court said, "Let's be more precise," then read for the jury the exact language of the instruction, which states only that the lap belt did not provide adequate protection and that Ford did not warn of that dangerous condition; and

(3) After denying Ford's mistrial motion, the court said—outside the jury's presence—that it saw little difference between a dangerous condition and a defect and would allow Johan to argue to the jury that the instruction was the equivalent of a finding that the lap belt was a defect. As a result, Johan's lawyer made that argument to the jury.[12]

If these comments misled the jury to believe that the technical feasibility defense to the design defect claim had been decided against Ford, then error occurred. As set forth below, however, we do not believe that is what happened. As to the remark by Johan's lawyer during his opening statement, he immediately moved into a discussion of other issues the jury had to decide, the first of which was technical feasibility. Therefore, we do not believe the jury would interpret the preceding remarks as an indication that the technical feasibility issue was somehow covered by the instruction or removed from the jury's consideration. As to the second comment, by telling the jury that the language from the instruction was more precise than stating that the lap belt had been found to be defective, the trial court impliedly rejected the contention that a dangerous condition was the same as a defect.

---

[12] The portion of the transcript cited by Ford involves Johan's response to Ford's argument concerning the technical feasibility of a three-point restraint in the rear center seat. Johan's lawyer pointed out that "[t]hat has already been ruled against. They are already toast on the two-point belt. They are wrong. It is defective. It doesn't give adequate protection. They didn't warn about it."

As to the court's statement that Johan's lawyer could argue that the lap belt had been found to be defective, those comments were made outside the jury's presence and, by themselves, had no effect on the outcome. Instead, because at the heart of Ford's contention is a claim that the court erred in its interpretation and application of a jury instruction, we look to the evidence, the other instructions, and the closing arguments in their entirety to determine whether prejudicial error occurred. (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 976 [105 Cal.Rptr.2d 88] [test for instructional error in civil cases depends heavily on the nature of the error, requiring us to examine the state of the evidence, the effect of other jury instructions, the effect of counsel's arguments, and any indications by the jury that it was misled; the error must have been prejudicial, and the prejudice must have been probable, not just possible].)

Ford introduced extensive evidence on the technical feasibility issue, including expert testimony on the following points: Ford wanted to design a three-point restraint system for the rear bench center seat; a design requirement of a minivan includes having a rear bench that folds flat and can be removed; those design requirements made it difficult to attach a shoulder harness assembly to the van; because the seat must be removable, it must be lightweight; prototype seats were built from high-strength, low-weight metals, but the casting process used to construct the prototypes could not be repeated; the prototypes Ford built would not have passed then-existing federal safety standards; later prototypes built with more conventional materials in 1997 would not have passed federal safety standards; in 1996, there were no alternative three-point harness designs in the rear center seat of other vehicles sold in the United States that met federal safety standards; lap and shoulder harness designs on Ford minivans sold in the United Kingdom in 1996 were installed for seats that could be removed only by unbolting them from the floor; and three-point harness restraints can be very dangerous to small children because they can cause upper spine injuries. Johan's own expert witness admitted on cross-examination that federal safety studies from the mid- to late 1980's showed that lap belts were very effective in preventing deaths and reducing injuries and that even as of the time of trial the federal government did not require three-point restraints in rear center seats. This evidence, and the issue of technical feasibility, were discussed at length by the parties during their arguments to the jury.[13] Also, the jury was instructed that it had to make findings on that issue, and we presume that the jury

---

[13] Although technical feasibility can be viewed as just one part of the overall risk-benefit analysis conducted in design defect claims, our Supreme Court has declared that the entire analysis involves "technical issues of feasibility, cost, practicality, risk, and benefit [citation] which are 'impossible' to avoid [citation]." (*Soule, supra,* 8 Cal.4th at p. 567.) Given the evidence that the jury received on this issue, and the arguments that were made, we believe the jury was allowed to consider technical feasibility in the latter, all-encompassing manner described by *Soule.*

followed that instruction. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803 [16 Cal.Rptr.3d 374, 94 P.3d 513] (*Cassim*).) In short, given the abundant evidence and argument that the jury heard on the technical feasibility issue, along with the instructions which told the jury it had to make a finding on technical feasibility, we do not believe sanction No. 2 was expanded so as to preclude the jury from reaching the issue.

Ford also contends that the trial court used sanction No. 2 to exclude a variety of mostly historical evidence about federal automotive safety standards and how they affected Ford's decision to have a lap belt, not a three-point system, in the rear center seat. This included evidence that the federal government at one time required lap belts in order to secure child safety seats, and that no manufacturer in 1996 or earlier warned that a lap belt was a dangerous condition. It also included an attempt to have Ford's expert testify that lap belts were effective in reducing injuries, then allowing Johan's lawyer to cross-examine the expert on that topic.

Although these disputed rulings were issued in the context of interpreting a discovery sanction, they were still rulings to exclude evidence. In order to obtain a reversal based on the erroneous exclusion of evidence, Ford must show that a different result was probable if the evidence had been admitted. (Evid. Code, § 354; *People v. Earp* (1989) 20 Cal.4th 826, 880 [85 Cal.Rptr.2d 857, 978 P.2d 15].) Ford's appellate brief describes the excluded evidence only in general terms and refers us to specified pages in the reporter's transcript where it sought admission of the evidence, but does not set forth the evidence it claims was erroneously admitted, does not acknowledge all the other evidence that was admitted on the issue of technical feasibility, including evidence of federal studies showing that lap belts were effective and of how federal regulations still did not require three-point restraints in the rear center seat, and does not discuss or analyze how a different result would have been probable if the disputed evidence had been admitted. We therefore deem the issue waived. (20 Cal.4th at p. 880.)

Finally, Ford contends the trial court erred by instructing the jury that certain testimony by its expert on the issue of lap belt effectiveness could be considered only for purposes of punitive damages, and could not be considered "for the proposition if the seat belt in this case did not provide adequate protection to plaintiff, and if Ford failed to warn plaintiff of this dangerous condition." We have already held that the instruction issued pursuant to sanction No. 2 was appropriate and we see no error in telling the jury that it could not consider evidence for a proposition inconsistent with that instruction. However, to the extent evidence about the effectiveness of lap belts was relevant to the issue of technical feasibility, the instruction was wrong because it told the jury the evidence was relevant to punitive damages only.

Even so, we conclude that the error was harmless. As noted earlier, Ford introduced a great deal of evidence on the technical feasibility issue, including an admission from Johan's expert witness that lap belts were effective. Ford does not explain how precluding the jury from considering that one piece of evidence was enough to tip the scales and lead the jury to find differently on the technical feasibility issue. We do not believe it was. Combined with the fact that the jury found for Johan on the alternative failure to warn theory, any error was harmless.[14]

### D. *The Special Instruction on Concealing Evidence Was Proper*

Special instruction No. 1 told the jury that Ford had attempted to conceal evidence from being used at trial, and that the jury could consider that fact in determining what inferences to draw from the evidence as it related to the technical feasibility issue. The instruction, which is based on Evidence Code section 413, was ordered as a lesser sanction to original sanction Nos. 4 and 5 which was suggested by our *Palma* notice and then adopted by the trial court at the August 15, 2003, hearing.[15] Ford contends the revised sanction was imposed without notice and an opportunity to be heard and must be reversed. Although it does not appear that Ford had a chance to consider the sanction beforehand, the August 15 hearing was set with two weeks' notice to give the parties the opportunity to address the issue of what lesser sanctions might be appropriate after we had issued our *Palma* notice. Ford did not object that it had not been given proper notice and did not ask for a continuance of the hearing. Instead, it argued the matter on the merits. We therefore hold that the notice issue has not been preserved for appeal. (*Anderson v. Metalclad Insulation Corp.* (1999) 72 Cal.App.4th 284, 291 [85 Cal.Rptr.2d 331].)[16]

---

[14] In connection with this, we believe telling the jury the lap belt was defective was not necessarily incorrect as to the failure to warn theory. Some courts have concluded that a flawless product that is dangerous is rendered "*defective*" by a failure to warn of the product's dangerous propensities (*Finn v. G. D. Searle & Co., supra,* 35 Cal.3d at pp. 699–700), and the jury was properly instructed that the lap belt was a dangerous condition about which Ford failed to warn. On the design defect claim, however, a product is not defective if an alternative design was not technically feasible. Because technical feasibility was at issue, it would have been better to restrict Johan's argument to statements that the product had been found to be "*dangerous*" rather than "*defective*" in order to avoid confusing the two concepts. We observe that the new form jury instructions have deleted previous references to the terms "defect" or "defective" when referring to the failure to warn theory. (Compare CACI No. 1205 with BAJI No. 9.00.7.) Regardless, for the reasons set forth above, we believe that any error was harmless.

[15] Evidence Code section 413 provides: "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case."

[16] Ford's reliance on *Urshan v. Musicians' Credit Union* (2004) 120 Cal.App.4th 758 [15 Cal.Rptr.3d 839], for the proposition that no waiver occurred is misplaced. At issue in *Urshan*

Ford also contends that special instruction No. 1 was improper because: (1) there was no evidence of willful suppression; (2) despite its lawyer's requests, the court refused to specify the precise evidence Ford tried to conceal, meaning Ford did not know why that sanction was being imposed; (3) the sanction was not designed to remedy any discovery prejudice because Ford's witnesses had already been deposed about the documents and because sanction Nos. 6, 7, and 8 provided adequate relief; and (4) under *People v. Bell* (2004) 118 Cal.App.4th 249 [12 Cal.Rptr.3d 808] (*Bell*), special instruction No. 1 allowed the jury to speculate improperly, without appropriate guidance, as to what it should do about Ford's misconduct. According to Ford, this error was exacerbated by Johan's closing argument, which repeatedly brought up the instruction in order to smear Ford and inflame the jury.

Ford's first three arguments ignore the referee's findings in his fifth report. The referee found that Ford never disclosed that documents responsive to TCT's discovery requests could be found in the passive restraint reading room, directing it instead to the rear belt reading room. Those documents were fortuitously discovered by a TCT paralegal working on another case. The referee then found that Ford never prepared a declaration identifying the documents in either of the two reading rooms, and that Ford's failure was intentional. As a result, TCT was forced to depose numerous witnesses and created such delays that the discovery cutoff had passed, at which point Ford declared it would produce no more witnesses or documents. The referee also found that instead of telling TCT and Johan early on that evidence concerning Ford's three-point restraint prototypes was in the possession of Ford's outside contractors, Ford said it would produce the information. By the time Ford told the truth, TCT was unable to obtain the information. Ford's conduct was not in good faith, the referee found.

The findings that Ford acted intentionally and in bad faith are the functional equivalent of a finding that it acted willfully. As for the court's refusal to specify what documents or evidence Ford tried to conceal, the trial court said that because Ford had "decided to play hide-the-ball," it would "have to pay the price." We agree. As TCT's motion and the referee's findings made clear, Ford was being sanctioned for precisely that misconduct. Ford's discovery violations essentially prevented Johan from obtaining complete

---

was a trial court's sua sponte order shortening the statutorily required notice period for summary judgment motions, essentially strong-arming the plaintiff into following the shortened time schedule that followed. Critical to the order reversing the summary judgment that was entered for the defendant was the fact that any objection to the statutorily unauthorized shortened notice period would have been futile. (*Id.* at p. 768.) At issue here was not a motion for discovery sanctions in the first instance. Instead, the court and the parties were trying to fashion lesser alternative sanctions to those previously ordered after Ford sought writ relief from this court and we signaled our intention to grant it. We see nothing in the record that suggests an objection by Ford or a request for a continuance would have been futile.

discovery. As a result, it is impossible to specify precisely what Ford tried to conceal. Under these circumstances, Ford's claim that it did not know why it was being sanctioned rings hollow. We also reject Ford's contention that special instruction No. 1 was not warranted because its witnesses were deposed and because sanction Nos. 6, 7, and 8 meant Ford could not introduce evidence that it was unaware of the technical feasibility of a three-point restraint and could not object to any evidence obtained from the two reading rooms. Ford's inability to introduce evidence that it was unaware of the technical feasibility of a three-point system only came into play if it were shown that such a system was feasible, and Ford was allowed to introduce evidence on that issue. Ford's impedance of Johan's discovery on technical feasibility was the point of the referee's findings and supported the lesser sanction of special instruction No. 1 instead of original sanction Nos. 4 and 5, which were more severe. The jury was correctly told that in determining whether a three-point restraint was technically feasible, it could take into account the fact that Ford had tried to suppress evidence on the subject. The instruction did not tell the jury that a three-point restraint system was technically feasible.

As for *Bell, supra,* 118 Cal.App.4th 249, we believe it is inapposite. The defendant in *Bell* was convicted of murder. At trial, he called three alibi witnesses. Due to delays caused by defense counsel and his investigator, the prosecutor got the statements of those witnesses just 10 days before trial, not the 30 days required by the criminal discovery statutes. The court allowed the alibi witnesses to testify, but instructed the jury pursuant to CALJIC No. 2.28 that the defendant failed to timely disclose the witness statements without lawful justification and that the "weight and significance of any delayed disclosure are matters for your consideration. However, you should consider whether the untimely disclosed evidence pertains to a fact of importance, something trivial or subject matters already established by other credible evidence." The Court of Appeal reversed the judgment for two reasons: First, the instruction blamed the defendant personally for the untimely disclosure, when the evidence showed that the fault lay solely with defense counsel and his investigator; second, there was no evidence that the prosecution was actually disadvantaged by the delay; and third, because the instruction did not tell the jury what, if anything, it should do, the jury was left to speculate about what to do and might have led it to conclude it could find the defendant guilty simply because he failed to comply with the discovery statute. (*Bell, supra,* 118 Cal.App.4th at pp. 254–256; see also *People v. Lawson* (2005) 131 Cal.App.4th 1242, 1247–1249 [32 Cal.Rptr.3d 634].) Unlike *Bell,* the referee here found prejudice from Ford's discovery conduct and the jury in this case was told precisely what it could do with a finding that Ford tried to conceal

evidence—determine what inferences to draw about the technical feasibility of a three-point restraint system. Therefore, *Bell* and its rationale do not apply here.

## 2. *Ford Waived Its Objections to Plaintiff's Arguments About Concealing Evidence*

During closing argument, Johan's lawyer made several references to special instruction No. 1 and Ford's attempted concealment of evidence, stating this is what they did (conceal documents) to a "little boy [that was] five years old," that the jury could either "vote for Johan or . . . vote for the people that destroyed the records," and that Ford had hidden and torn up documents. Ford contends that these comments misused special instruction No. 1 as an argument in favor of punitive damages, thereby improperly expanding its reach. (See *De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 918 [114 Cal.Rptr.2d 708] (*De Anza*) [litigation conduct and trial tactics may not serve as a basis for punitive damages].)[17] Ford also contends that this argument mischaracterized the evidence because there was no proof that Ford had ever destroyed or torn up any documents.

We agree that any references to Ford having destroyed or torn up documents was not supported by the evidence and constituted improper argument. We reject Ford's legal contentions, however, for two reasons: First, because Ford did not object until the last comment was made, and second, because the last comment was harmless.

Of the passages Ford cites as improper argument, Ford objected to only one of them. Ordinarily, failure to object waives any error. (*Cassim, supra,* 33 Cal.4th 780.) Ford contends that because it filed an unsuccessful motion in limine to prevent Johan from making the same objectionable arguments, it preserved the issue. (*People v. Wharton* (1991) 53 Cal.3d 522, 549, fn. 3 [280 Cal.Rptr. 631, 809 P.2d 290].) An examination of *Wharton* makes clear why that decision is inapplicable. The defendant in *Wharton* unsuccessfully raised the psychotherapist-patient privilege before trial to exclude the testimony of two therapists, but did not raise the claim again during trial. On appeal, the court held that the issue had not been waived because the defendant's pretrial motion was "advanced on a specific legal theory, was directed to a 'particular,

---

[17] *De Anza* did not involve arguments based on discovery violations. Instead, the plaintiff did not pursue its tort claims and sought punitive damages based solely on litigation tactics such as taking unreasonable legal positions, along with acts of intimidation and harassment. A decision not cited by Ford—*Palmer v. Ted Stevens Honda, Inc.* (1987) 193 Cal.App.3d 530, 539–540 [238 Cal.Rptr. 363]—could be read to support Ford's position, but we need not reach that issue. Instead, we assume, but do not decide, that the disputed remarks were improper.

identifiable body of evidence,' and the motion was made 'at a time . . . when the trial judge [could] determine the evidentiary question in its appropriate context.' " (*Ibid.*) In contrast, Ford's motion in limine was filed in June 2002, two weeks before TCT brought the discovery motion that led to the referee's fifth report and the discovery sanctions, and more than eight months before those sanctions were recommended by the referee. The motion was aimed at precluding evidence of Ford's "alleged" discovery abuses and, for obvious reasons, made no mention of comments during a closing argument that would not occur for another 15 months. Unlike *Wharton*, therefore, Ford's motion was not directed to any particular, identifiable comments and was not made at a time when the trial court could determine the question in its appropriate context.

Ford also contends that it was excused from making any objections because they would have been futile, pointing to the following: (1) the trial court made it clear early on that Johan would be allowed to argue Ford's concealment of evidence; and (2) the court's comments in denying Ford's posttrial motions for a new trial and a judgment notwithstanding the verdict showed that it would have overruled any objections. Neither contention is well taken.

The first is based on the court's statement right before trial started that Johan would not be allowed to mention the evidence concealment instruction during his opening statement, but would be allowed to raise the issue when arguing the case to the jury. Stating that Johan would be allowed to argue a proper jury instruction is hardly an anticipatory endorsement of any later improper arguments based on that instruction, and we therefore reject Ford's contention.

The second is based on comments by the trial court during Ford's posttrial motions for a new trial and a judgment notwithstanding the verdict. Ford's complaints about the closing argument comments of Johan's lawyer formed a small part of those motions. The hearing on those motions focused on one of Ford's contentions—that jury misconduct called for reversal.[18] As part of Ford's argument on the jury misconduct issue, it pointed out how Johan's arguments concerning the evidence concealment instruction connected with that alleged misconduct. That led to a brief discussion about how the concealment instruction was argued, with the court stating it was not sure if any of the disputed comments were improper. At one point, the court said that Johan's lawyer "took my instruction and ran with it, like a good lawyer would. You would have done the same thing had the sanctions been in your favor. You know it as well as I do. He did what he did as a competent attorney." We acknowledge this casts some doubt as to how the court might

---

[18] We discuss that issue, *post.*

have ruled had Ford timely objected to the disputed remarks by Johan's lawyer. However, given the context in which the court's statements were made, we cannot say as a matter of law that proper and timely objections by Ford at the first instance of alleged misconduct would have been overruled.

The one comment to which Ford raised an objection came at the very end of Johan's rebuttal argument. After Johan's lawyer said, "This is your chance that maybe companies won't try to destroy . . . ," Ford's counsel cut him off with an objection. That objection was overruled, and Johan's lawyer then said, "This is a chance for you to say, 'Hey Ford, if you know about a problem that is taking place, then do something about it.' " Johan's lawyer concluded his argument soon after, with no mention of special instruction No. 1 or Ford's attempt to conceal evidence. It is not entirely clear that Johan's lawyer was even going to say anything about concealment before the objection was made. Even if he were, however, and the court erred by overruling the objection, because Johan's lawyer did not complete the thought or mention concealment of documents again, and because other comments about Ford having destroyed documents came in without objection, there was no prejudice from that one comment.

As for Ford's complaint that Johan's lawyer used special instruction No. 1 during closing argument as a basis for awarding punitive damages, we first reject that contention because the jury was instructed to use the attempted concealment evidence only as to technical feasibility, and we presume the jury followed that instruction. (*Cassim, supra,* 33 Cal.4th at p. 803.) And, as above, the issue was waived for failure to object except as to the last comment, which was harmless.[19]

3. *The Trial Court Did Not Err by Reinstating Johan's Punitive Damage Claim*

Shortly before the referee issued his fifth report and recommendation for sanctions, a different judge than the trial judge granted Ford summary adjudication on Johan's punitive damage claim because there was no evidence that high level corporate officers or employees acted in a despicable manner with a willful and conscious disregard of consumer safety. (Civ. Code, § 3294, subd. (b); *Ehrhardt v. Brunswick, Inc.*(1986) 186 Cal.App.3d 734, 741 [231 Cal.Rptr. 60].) The court also found that the warnings contained in the Windstar owner's manual refuted any inference of conscious disregard of

---

[19] We also note that none of the comments complained of in Ford's brief actually contained a direct call for the jury to award punitive damages based on Ford's discovery misconduct. In fact, when Johan's lawyer argued the punitive damages issue, he tried to distinguish Ford's litigation conduct, such as "lying about the documents" and using untrustworthy experts from something that was "really bad"—that Ford knew lap belts were very dangerous.

child safety. After the referee's fifth report and sanctions recommendations were issued, Johan sought reconsideration of the summary adjudication ruling, contending that the discovery sanctions filled in the evidentiary gaps as to the knowledge of senior management that led to the original ruling. The issue was presented to the judge who heard the original motion. That judge granted the motion for reconsideration and reinstated Johan's punitive damages claim. Ford contends this was error because the sanctions did not remedy the evidentiary defects that led the court to grant the summary adjudication in the first instance.

■ Marketing a product that is known to be defective and dangerous to consumers supports an inference of malice for purposes of punitive damages. (*Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 814 [174 Cal.Rptr. 348].) At the time the court granted reconsideration and reinstated the punitive damages claims, the original sanctions recommendations had not yet been modified to substitute the concealment instruction for sanction Nos. 4 and 5. The original sanctions established that the lap belt was a dangerous condition about which Ford gave no warnings, and that Ford could have installed a three-point restraint. The sanctions also prevented Ford from introducing any evidence that it warned Johan of the dangerous condition, that its management was not aware of the failure to warn, that it was not technically feasible to develop a three-point restraint system, and that Ford was unaware that a three-point system was technically feasible. The combined effect of these original sanctions could lead a jury to conclude that Ford, including senior management, knew it was marketing a defective and dangerous product and failed to warn about those dangers.

Ford also complains that reconsideration was improperly based in part on sanction Nos. 4 and 5, which were later removed and replaced with special instruction No. 1 as a lesser sanction, but cites no authority for the proposition that we should review the trial court's reconsideration order based on subsequent facts or changed circumstances. If Ford believed that replacing sanction Nos. 4 and 5 with the lesser sanction was that significant on the punitive damages claim, it could have sought reconsideration of the order reinstating punitive damages or asked the court to look at the issue again in light of the modified sanction. (See *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1108 [29 Cal.Rptr.3d 249, 112 P.3d 636].) It did not.

### 4. *Sanctions Against Johan for Loss of the Rear Bench Seat*

More than a year before trial, Ford brought a motion in limine to preclude Johan from presenting evidence that his lap belt had been properly tightened and adjusted. That motion was based upon the disappearance of the rear bench from the Karlssons' Windstar at some point after TCT's experts had

been able to examine it. According to Ford's motion, a physical examination of Johan's lap belt was necessary in order to look for signs of wear and stress, including occupant "loading" of the latch plate which would show whether the belt had been worn properly. All that remained after TCT's examination were photographs that TCT took of the rear bench and the lap belt. Johan did not file written opposition to the motion, but TCT did, arguing that Ford had other evidence from which it could argue that Johan had not been properly belted. TCT also argued that the proposed sanction went too far, because Ford would still be allowed to offer expert testimony about the lap belt based on the photographs, meaning Johan should be allowed to present contrary opinion testimony based on that evidence. No supporting declaration or evidence of any kind was offered by the parties in support of or opposition to the motion. At an August 25, 2003, hearing concerning numerous pretrial motions, the court denied the motion, but said Ford could introduce evidence that the seat was missing. The court also indicated that it might give an instruction on that point as well. At trial, the court instructed the jury pursuant to Evidence Code section 413 that if it found a party had willfully suppressed or destroyed evidence that the jury could consider that fact in determining what inferences to draw from the evidence. The jury received evidence that Johan's lawyer took possession of the Windstar in July 1997, and Ford argued the disappearance of the rear seat to the jury.

Ford contends that the court erred by denying its motion in limine. Rather than acknowledging that a lesser sanction was imposed by allowing Ford to argue that Johan had concealed the evidence, Ford's opening brief states simply that the trial court "denied this motion" and refused "to take any corrective action." Ford glosses over the lesser sanction by an oblique, footnoted reference to the court having allowed it to "argue the spoliation inference." Even though Johan's brief does mention the lesser sanction, Ford's reply brief does not address it. As properly framed, the issue before us should be whether the trial court abused its discretion by imposing a lesser sanction than Ford requested. Ford did not address that issue at all until filing an unrequested supplemental brief shortly before oral argument, and we therefore deem it waived. (*Landry, supra,* 39 Cal.App.4th at pp. 699–700.)[20]

### 5. *Although Juror Misconduct Occurred, It Was Not Prejudicial*

Ford contends that Juror Bowman committed prejudicial misconduct in three instances: (1) midtrial, when he saw a television news report about the

---

[20] As part of its argument, Ford contends the trial court's error was compounded by its decision to allow Johan to call a last-minute, undesignated expert witness. While our holding that the sanctions issue has been waived means we need not reach the expert witness issue, we note that this argument was not supported by citation to authority or analysis. (Cal. Rules of Court, rule 14(a)(1)(B).)

trial; (2) during jury deliberations when he examined a 2003 Windstar, saw that the center rear seat still had only a lap belt, which he took to mean Ford had done nothing to correct its misconduct; and (3) when he examined a Ford Mercury minivan and saw that it had a three-point restraint, which he took to mean that Ford could have installed a three-point restraint in the Windstar if it wanted to. Based on this, Ford sought both a mistrial and a new trial, but its motions were denied.

■ Jury misconduct is a ground for a new trial. (Code Civ. Proc., § 657, subd. (2).) Receiving evidence from sources outside of trial, or reading news reports about the trial, is generally considered to be misconduct. (*People v. Nesler* (1997) 16 Cal.4th 561, 578 [66 Cal.Rptr.2d 454, 941 P.2d 87] (*Nesler*); *People v. Cummings* (1993) 4 Cal.4th 1233, 1331 [18 Cal.Rptr.2d 796, 850 P.2d 1].) Once misconduct occurs, it raises a presumption of prejudice that can be rebutted by an affirmative evidentiary showing that prejudice does not exist, or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171].) In reviewing the trial court's ruling on a new trial motion, we accept the trial court's credibility determinations if they are supported by substantial evidence, including all favorable inferences that may be drawn from the evidence. Whether prejudice arose is a mixed question of law and fact subject to our independent review. (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 508, & fn. 3 [90 Cal.Rptr.2d 502].)

The television news story incident occurred during the trial. Bowman saw a news report on KNBC that aired on Thursday, September 17, 2003, and the court attendant overheard Bowman tell some other jurors that "it must be a famous case if it was on the news." The court reviewed a transcript of the story, which included a statement by the reporter that Ford would not "be able to challenge in front of the jury [that the lap belt was defective]. That's Ford Motor Company's punishment according to a judge, for [allegedly] not turning over important documents." The reporter also attributed to a Ford spokesperson that Ford "has a solid history of ethical behavior during litigation [and] to suggest otherwise is ridiculous. What's more, this accident is in the top 10% for severity and the vehicle did an outstanding job protecting the occupants. [¶] This accident is a tragic reminder that seatbelts can protect passengers only when they are used properly. Ford says that little Johan did not have a seatbelt on properly." Ford asked to have Bowman removed from the jury. The court attendant questioned the jurors and concluded Bowman was the only juror who saw the news report. The court questioned Bowman, who said the story was "very innocuous," had no bearing on the case, and that he could easily disregard it. Ford declined the chance to question Bowman. The court did not remove Bowman but said it

would admonish the jury to disregard any news coverage. Ford's lawyer said that was agreeable. On the following Monday, September 22, Ford moved for a mistrial based on Bowman's actions. The court reviewed the videotape and denied the motion because the news report included Ford's point of view and was "innocuous," and because Bowman said he could disregard it and would consider only the evidence at trial. Ford raised the issue again as part of its new trial motion, and the trial court denied it again on the same basis.

We believe the trial court did not err.[21] Ford's biggest complaint is that the story incorrectly informed Bowman that Ford could not contest whether the lap belt was defective. First, as we have already observed technical feasibility was irrelevant on the failure to warn theory, one of the two bases for the jury verdict (see fn. 13, *ante*). As to the design defect, we discussed at length in discussion part 1.C., *ante,* that it was made very clear to the jury that the evidence concealment instruction did not affect Ford's ability to show that a three-point restraint was technically infeasible. The transcript of the news story also included several comments favorable to Ford, especially the reporter's conclusion that Ford claimed Johan had not worn his seat belt properly and that what happened to Johan was a reminder of the need to do so. On balance, we believe the innocuous nature of this story rebutted any presumption of prejudice. (*People v. Marshall* (1996) 13 Cal.4th 799, 864 [55 Cal.Rptr.2d 347, 919 P.2d 1280].)

The two other asserted instances of misconduct by Bowman were supported by the affidavits of two jurors, who stated that on October 14, 2003, while the jury was deliberating on punitive damages, Bowman said he had visited a Ford dealership over the weekend in order to inspect current Ford models. Bowman supposedly said he examined a current model Windstar and found that a lap belt was still used in the rear bench center seat. Bowman said he had also examined a Mercury vehicle that had a three-point system in the center rear position. According to the jurors, Bowman said this showed that Ford could install such a system if it wanted to, and that it had done nothing to correct the situation in the Windstar.

In opposition, Bowman said he inadvertently parked next to a Mercury Mountaineer in a shopping mall's parking lot. He peeked into the vehicle and saw the second row bench seating. He also admitted seeing a 2003 Windstar at a Ford dealership. Bowman denied saying that what he saw demonstrated

---

[21] Ford appears to have analytically lumped together the court's rulings refusing to remove Bowman, denying Ford's mistrial motion, and denying Ford's new trial motion. Because all these raise virtually the same issues, this makes no difference to our analysis and we will discuss them in combination.

that Ford could install a three-point system if it wanted to. According to Bowman, the jury had already decided to award punitive damages by that time, and was deliberating about the size of the award. Juror Houchin submitted a declaration stating that Bowman might have mentioned seeing a current model Windstar. Jury Foreperson Yoshizuka said that while Bowman might have mentioned something about seeing a 2003 Windstar, it was a passing comment.[22]

The trial court found that the factual statements in the declarations of Bowman, Houchin, and Yoshizuka were true. Specifically, the court found that Bowman went to a Ford dealer intending to examine current Ford models; Bowman did not contradict that assertion in his declaration. Because the jury heard evidence from Ford's design engineer that the 2003 model Windstar still had just a lap belt in the rear bench center seat, the court concluded that Bowman's observations and statements about that were simply cumulative of the evidence and therefore not prejudicial. The court was troubled by Bowman's view of the Mercury Mountaineer, because the undisputed evidence showed that he must have said something to the other jurors about having noticed that it had a three-point restraint in the second row bench seats. However, because the jury heard evidence that Ford was capable of installing three-point restraints in the center bench seats of other Ford vehicles, the court believed Bowman's observations and comments were also merely cumulative, thereby rebutting the presumption of prejudice.

In reviewing this issue, we must first determine what the evidence shows took place, keeping in mind that the court accepted as true the assertions in the declarations of Bowman and his supporting jurors. Based on the evidence, it appears that Bowman went to a Ford dealer for the purpose of examining the then-current model Windstar, and saw that the rear bench center seat still had a lap belt. Bowman also took a peek inside a Mercury Mountaineer he had parked next to and noticed that its second row bench center seat had a three-point restraint. Bowman did not say that his view of the Mountaineer showed that Ford could install a three-point restraint if it wanted to. He did not deny saying that 2003 model Windstar still had a lap belt in the rear bench center seat. Juror Houchin declared that Bowman might have mentioned seeing a 2003 Windstar. Juror Yoshizuka said that Bowman made a passing comment about having done so.

---

[22] The declarations of these jurors also included statements about their internal thought processes, including testimony that nothing Bowman might have said had any impact on them. Ford objected to those portions of the declaration because they were inadmissible. (Evid. Code, § 1150.) The trial court correctly sustained Ford's objections and said it would disregard those portions of the declarations.

We believe the presumption of prejudice from these incidents was rebutted because the jury already heard from Ford's own witness that the 2003 Windstar still had a lap belt in the rear bench center seat, and the jury also heard that Ford had installed three-point restraints in other vehicles, making Bowman's comments and personal observations cumulative of the evidence (*People v. Sutter* (1982) 134 Cal.App.3d 806, 820–821 [184 Cal.Rptr. 829].)[23] Furthermore, Bowman looked at the Mountaineer's middle-row seat when he saw the three-point restraint, and the jury already knew that the 1996 Windstar had such a restraint in the middle seat of its middle-row bench.

We also believe the presumption of prejudice was rebutted based on the evidence before the trial court and its findings when ruling on the new trial motion: (1) Bowman said nothing about the Mercury other than having seen a three-point restraint; (2) he said nothing about the 2003 Windstar other than noting that it still had a lap belt in the rear bench center seat; (3) his comments were described as having been made in passing and there is no indication that he ever brought the matter up again, or urged the jury to consider those matters in its deliberations; and (4) the disputed observations and comments related to only technical feasibility design defect, while the jury found liability under both that theory and the separate failure to warn theory.

Ford contends that even if the other jurors were unaffected by Bowman's misconduct, the fact that Bowman took the trouble to mention what he saw establishes that he was actually biased, compelling a finding of prejudice. (*Nesler, supra,* 16 Cal.4th at pp. 578, 586–587.) Bias in this context is the same type of bias that would permit a challenge for cause to a prospective juror and requires a showing of a state of mind on the part of the juror which will prevent him from acting with entire impartiality and without prejudice to the rights of any party. (*Id.* at p. 581.) Actual bias existed in *Nesler* when a juror, during deliberations on the sanity phase of a murder trial, met someone in a bar who claimed to have worked for the defendant as a babysitter and discussed the defendant's drug use and acts of child neglect. When those issues arose during the jury's deliberations, the juror repeatedly interjected what she had learned and used that information in order to persuade the other jurors. Based on that conduct, the Supreme Court concluded that the offending juror had been actually biased against the defendant. (*Id.* at pp. 583–587.)

---

[23] On cross-examination by Johan's lawyer, a Ford witness testified that the then-current 2003 Windstar still had only a lap belt in the rear center seat. One of Johan's experts testified on redirect examination that before 1996, a Ford station wagon sold in Australia had three-point belts all across the rear bench seats, while another testified that such a system was technologically feasible for minivans sold in the United States before 1996, and that Ford had such a system as of 1995 in its transit bus, a minivan-sized vehicle being sold in the United Kingdom.

As discussed above, however, the evidence accepted by the trial court shows that Bowman made only a passing reference to having seen a lap belt in the 2003 Windstar, and, although he said something about seeing a three-point restraint in the Mercury, did not say that it showed Ford could have installed one had it wanted to. There is no suggestion that he said anything more than that, repeated what he had seen, or used that information to persuade the other jurors. Accordingly, we hold that there was an insufficient showing that Bowman was actually biased against Ford.[24]

## 6. *Ford Waived Its Federal Preemption Claim*

 Citing *Geier v. American Honda Motor Co.* (2000) 529 U.S. 861 [146 L.Ed.2d 914, 120 S.Ct. 1913], and *Griffith v. General Motors Corp.* (11th Cir. 2002) 303 F.3d 1276, Ford contends that Johan's entire action is preempted by federal automotive safety standards concerning passenger restraint systems. We need not resolve this issue, however. Because Ford did not raise preemption below, but has instead raised it on appeal for the first time, the issue is waived. (*Hughes v. Blue Cross of Northern California* (1989) 215 Cal.App.3d 832, 849 [263 Cal.Rptr. 850].) Ford contends that its federal preemption claim is one of subject matter jurisdiction, which cannot be waived, rather than choice of law, which is waivable. We disagree. *Geier* and *Griffith* were decided under the National Traffic and Motor Vehicle Safety Act (NTMSA), which includes a provision preempting state regulations and lawsuits that actually conflict with that act (49 U.S.C. § 30103(b)(1)) and a provision permitting state law tort claims for product liability that do not conflict with it. (49 U.S.C. § 30103(e); *Geier,* at pp. 868–869.) Subject matter jurisdiction concerns the authority of the court to try a certain type of action, and involves areas of exclusive federal jurisdiction, such as bankruptcy, admiralty, and patent law. Where jurisdiction resides in both the federal and state courts, whether federal law applies is a choice of law question. Choice of law preemption issues may be waived. (*Hughes,* at pp. 849–851.) Because common law product liability claims are allowed under the NTMSA unless they conflict with its provisions, choice of law preemption was involved. Both *Geier* and *Griffith* were decided well before this case went to trial, and Ford should have raised the preemption issue in the trial court.

---

[24] Even so, we want Bowman to know that his conduct was improper and, with a different evidentiary showing, could have resulted in a new trial. It is particularly troubling that he looked at the two vehicles after the trial judge spoke to him outside the presence of the other jurors about watching the KNBC news story. Should he ever sit on another jury, we expect he will not repeat his misconduct.

## DISPOSITION

For the reasons set forth above, the judgment is affirmed. Respondent to recover his costs on appeal.

Cooper, P. J., and Boland, J., concurred.

A petition for a rehearing was denied July 27, 2006, and appellant's petition for review by the Supreme Court was denied September 27, 2006, S145694.