Filed 6/26/23 Drexler v. Ryckman CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| DAVID DREXLER et al., | B316564 |
| Plaintiffs, Cross-defendants, and Respondents, | (Los Angeles County Super. Ct. No. LC103510) |
| v. | |
| GERALD OWEN RYCKMAN et al., | |
| Defendants, Cross-complainants, and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, J. Stephen Czuleger, Judge. Affirmed and remanded with instructions.

Gerald Owen Ryckman and Judith Lorraine Ryckman, in pro. per., for Defendants, Cross-complainants, and Appellants.

Nemecek & Cole and Daniel L. Reback for Plaintiffs, Cross-defendants, and Respondents.

———————————————

The parties to this appeal jointly owned a three-story office building in Sherman Oaks, California (the Property). Plaintiff, cross-defendant, and respondent David Drexler operated his law firm, the Law Offices of David Drexler (the Firm), from the Property; the remainder of the Property was rented to other tenants. Defendant, cross-complainant, and appellant Gerald Owen Ryckman (Ryckman) worked at the Firm as an office manager and legal assistant; his spouse Judith Lorraine Ryckman (Mrs. Ryckman) worked at the Firm as a legal secretary.

On August 10, 2015, Ryckman stopped working at the Firm. Whether that departure was voluntary depends on whom you believe: Ryckman says it was not; Drexler says it was. We need not address that dispute because the court bifurcated Ryckman's employment-related claims and they are not now before us. The issues presented by this appeal involve only partition of the Property and related credits due to either party.

On November 2, 2015, Drexler and his spouse Laura Drexler, as trustees of the Drexler Trust dated June 24, 1994 (the Drexlers), sued for partition and for the Ryckmans to pay their proportionate share of the Property's post-separation operating costs. Mr. and Mrs. Ryckman, as trustees of the Ryckman Trust dated October 10, 1990 (the Ryckmans), cross-complained. They denied owing any contribution to the Property's operating costs and alleged, among other things, that they were due rent from the Firm's use of the Property as well as profits from the enhanced value of the Property following purported renovations to it.

In 2016, the trial court granted, in part, the Drexlers' special motion to strike the Ryckmans' cross-claims pursuant to

2

the anti-SLAPP statute, Code of Civil Procedure section 425.16.[1] The trial court also awarded the Drexlers $25,000 in attorney fees pursuant to section 425.16, subdivision (c) related to the anti-SLAPP motion.

Before trial, the court imposed evidentiary sanctions against the Ryckmans for discovery abuse that prohibited them from introducing evidence not disclosed in their court-ordered discovery responses, including any non-disclosed evidence of alleged rents or profits due to the Ryckmans. At trial, however, the court did not strictly enforce that order and admitted substantial evidence on these topics that the Ryckmans did not produce in discovery.

Following a bench trial, the trial court ordered partition of the Property by sale, and ordered the Drexlers and Ryckmans to share equally in the Property's operating costs since August 10, 2015, as well as the attorney fees incurred in prosecuting the partition action. The trial court ordered all third-party rents from tenants other than the Firm be split equally between the Drexlers and Ryckmans, but found that the Ryckmans did not prove that the Firm agreed to pay the Ryckmans $10,000 per month in rent. The trial court entered an interlocutory judgment reflecting its rulings.[2]

---

[1] All subsequent unspecified statutory citations are to the Code of Civil Procedure.

[2] The judgment was interlocutory because of the court's bifurcation of the partition claims from the remaining causes of action, including Ryckman's employment-related claims. A party may appeal "[f]rom an interlocutory judgment in an action for partition determining the rights and interests of the respective

3

The Ryckmans now appeal. First, they argue we should reverse the judgment because the trial court excluded evidence of the Ryckmans' entitlement to rents and profits by erroneously relying on "void" evidentiary sanctions orders. Second, they argue that substantial evidence did not support the trial court's finding that the Ryckmans were financially responsible for half the Property's operating costs. Third, they argue the trial court erred in ordering the Ryckmans to pay half of the attorney fees incurred in the partition action, because the Drexlers incurred such fees by refusing to accept the Ryckmans' settlement offers. The Ryckmans also argue that the trial court erred in precluding evidence of these settlement offers, failing to review the amount of fees for reasonableness, and not providing the Ryckmans an opportunity to challenge the fees. Fourth, the Ryckmans contend the trial court erred in awarding $25,000 in attorney fees related to the special motion to strike. Fifth, they contend the trial court did not make certain factual findings stated in the court-executed judgment prepared by the Drexlers' counsel.

We find no error in the trial court's rulings and judgment, with the exception of two statements included in the judgment that Ryckman "chose" to leave or "voluntarily" left the parties' business relationship. Accordingly, we affirm and remand with instructions to correct these statements.

## BACKGROUND

### A. General Legal Principles Relating to Partition

We begin with a brief summary of the law applicable to partition actions. " ' "[P]artition" is "the procedure for

---

parties and directing partition to be made." (§ 904.1, subd. (a)(9).)

4

segregating and terminating common interests in the same parcel of property." ' [Citation.]" (*Summers v. Superior Court* (2018) 24 Cal.App.5th 138, 142.) " 'The original purpose of partition was to permit cotenants to avoid the inconvenience and dissension arising from sharing joint possession of land.' " (*LEG Investments v. Boxler* (2010) 183 Cal.App.4th 484, 493.) Although partition is governed by statute, it is an action in equity. (See 4 Miller & Starr, Cal. Real Estate (4th ed. 2022) § 11:15, citing Code Civ. Proc., §§ 872.010 to 874.240.)

Upon determining the parties' interests in the property and ordering partition, a court may decide the manner of partition, including that the property be sold and the proceeds divided among the parties. (See *Summers v. Superior Court*, *supra*, 24 Cal.App.5th at p. 143; 4 Miller & Starr, Cal. Real Estate, *supra*, § 11:15 [Right of partition—Procedure in partition action].) "Every partition action includes a final accounting according to the principles of equity for both charges and credits upon each cotenant's interest. Credits include expenditures in excess of the cotenant's fractional share for necessary repairs, improvements that enhance the value of the property, taxes, payments of principal and interest on mortgages, and other liens, insurance for the common benefit, and protection and preservation of title." (*Wallace v. Daley* (1990) 220 Cal.App.3d 1028, 1035-1036; see § 872.140 ["The court may, in all cases, order allowance, accounting, contribution, or other compensatory adjustment among the parties according to the principles of equity"].) Further, "the court shall apportion the costs of partition" (§ 874.040), which include "[r]easonable attorney[ ] fees incurred or paid by a party for the common benefit" (§ 874.010), "among

5

the parties in proportion to their interests or make such other apportionment as may be equitable."  (§ 874.040.)

## B.    Relevant Factual Summary

We derive the following factual summary from the testimony and exhibits introduced at trial.

### 1.    *Drexler and Ryckman Begin Working Together*

In 1978, Drexler began working at a law firm where Ryckman was a legal assistant and office manager.  In 1985, Drexler started his own firm and recruited Ryckman to work with him.  According to Drexler, Ryckman conducted other ventures using the Firm's staff and while on Firm time, and Drexler considered Ryckman to be more like a consultant than an employee.  The Firm's bookkeeper, Griselda Quirarte (whom the parties referred to as Grace Rodriguez), confirmed that Ryckman conducted other business from the Firm's offices.

Drexler determined Ryckman's compensation in his sole discretion.  To do so, Drexler considered the Firm's expenses (including rent of $3,000 per month that the Firm paid from a "rental account"),[3] Ryckman's contribution to the Firm's cases, and what future matters were in the Firm's "pipeline."  From this, Drexler determined the Firm's profit and paid Ryckman the same amount as he paid himself.  "[B]ecause of ethical considerations," Drexler never split fees with Ryckman on individual cases.  Rather, Drexler would wait to see what the

_____

[3] The Firm had three bank accounts: a business operating account, a rental account, and a client trust account.  Drexler was the only signatory on the operating account although Quirarte had access and authority to conduct online transactions.

6

profits were, which sometimes occurred every three or six months.

2. *The Parties Purchase the Property*

In 2002, Drexler used funds from the Firm's operating account to make a $300,000 downpayment to purchase the Property. Drexler explained that in vesting title of the Property equally between Ryckman and himself, Drexler "went through the same process of decision-making that [he] did for all . . . Ryckman's compensation. [They] had profit in the office, it had been a good year. There was sufficient money to pay for it. And in [Drexler's] mind, if [he] hadn't used the money from [the Firm] to pay $300,000, [he] would have divided it equally between . . . Ryckman and [himself] anyways. So the bottom line was the same and [they] both thought that it was a good idea." Drexler thought it desirable to purchase the Property because the Firm would no longer need to pay rent for an office. Ryckman also testified that half of the money used for the downpayment would have otherwise been paid to him. It is undisputed that upon purchase the Drexlers' and Ryckmans' family trusts owned the Property equally.

After purchasing the Property, Drexler continued to compensate Ryckman as before and paid all operating expenses for the Property, including building maintenance and improvements, out of the Firm's operating account. The Firm used the rental account to pay the mortgage in the amount of $5,056 each month. Two tenants rented office space in the Property. In 2007, the Firm hired Quirarte, who provided bookkeeping and property management services. Each month, Drexler obtained rent checks from the two tenants, totaling approximately $3,200 per month, which he cashed and split

evenly between Ryckman and himself. The Firm also paid for maintenance and repairs of the two rental units.

Ryckman testified that when he and Drexler started the Firm, Drexler did not have money to pay him. Rather than receive a salary, Ryckman wanted Drexler to pay him what Drexler believed was the reasonable value of his services. Ryckman and Drexler orally agreed that they would be equal partners, equally share in the profits of the Property, equally participate in the management and control of the Property, and jointly make all decisions regarding the Property. Neither would encumber the Property without the permission of the other or take on any additional partners. They agreed the Property would be a long-term investment for the Drexler and Ryckman families.

3. *The Purported Agreement to Pay Rent to Drexler and Ryckman*

Whereas Drexler testified the purchase of the property saved the Firm from having to pay rent, Ryckman testified the Firm "rent[ed] the [Property] commencing immediately upon the close of escrow," for $20,000 per month, with $10,000 to be paid to the Ryckmans and $10,000 to be paid to the Drexlers. Ryckman claimed the Firm would pay all common tenant-related expenses. Ryckman claimed he and Drexler agreed that Drexler would pay any agreed-upon expenses from the Ryckmans' monthly share of the rent, that Drexler would establish a "joint rental trust account in the names of both Ryckman and Drexler, from which all financial transactions related to the [Property] would be transacted," and Drexler "[w]ould establish accounting records that include rents paid to the Ryckmans, rents paid to the Drexlers, along with all monies paid to or paid out in connection with the [Property]."

8

In support of his claim that the Firm paid rent to both the Ryckmans and Drexlers, Ryckman pointed to a $100,000 check from November 21, 2011 (approximately nine years after the Property's purchase) payable to Ryckman with a memo line that stated, "rent." He testified the check was to make up for rent payments that had not been made to him.[4] Mrs. Ryckman also testified that she and Ryckman received rental payments from the Firm, which they reflected on their tax records. For example, the Ryckmans' tax filings indicated rent paid to them in 2011 in the amount of $100,000, equal to the November 21, 2011 check. The Ryckmans summarized the rental income, mortgage interest, and building expenses they reported on their taxes in an exhibit, which also included several pages of tax schedules for supplemental income and loss from rental real estate. According to Ryckman, the Firm owed him $1,040,000 in unpaid rent. Ryckman conceded he did not have copies of any other checks for rent from the Firm besides the one for $100,000, but asserted he was aware of other checks written for $10,000, $20,000, or $50,000 purportedly for that purpose.

Drexler denied any agreement with Ryckman for the Firm to pay rent to the two of them and disputed that any check was given to the Ryckmans for payment of rent. Drexler testified the Firm gave the $100,000 check because Ryckman asked for a

---

[4] Ryckman testified he and Drexler "had a very loose relationship. Mr. Drexler would get behind on rents, then he would give me a check. I didn't run home and check it off. He would give me a check. Same thing with my wages. If I needed . . . some money . . . he would give me the check. He would do the crediting. My wife and the bookkeeper would keep track of what we're getting and that's it."

9

distribution and that Ryckman requested Drexler write "rent" on the memo line for tax reasons.

Ryckman questioned Quirarte extensively concerning transactions made to or from the Firm's rental account. In doing so, Ryckman relied on an exhibit comprised of a list, created by the Ryckmans during the litigation, of the Firm's financial transactions as well as Wells Fargo bank account records. Ryckman asked Quirarte whether he and Drexler "paid rent out of the [Firm's] rental account." Quirarte responded, "That's not to my knowledge. I don't know." She testified, "the rental account was for the mortgage," and that the mortgage payments were withdrawn automatically out of that account. Further, she indicated it was her general practice to transfer money between the operating account and the rental account as needed. For example, she made a transfer of $10,000 "from the operating account to the rental account to cover the rental mortgage." Ryckman also used what was described in the record as emails between Quirarte and the Ryckmans purportedly identifying amounts of rent the Firm paid to them[5] to attempt to refresh Quirarte's recollection that the Firm paid rent to the Ryckmans; Quirarte did not recall writing the emails.

Quirarte testified that she understood the "rent" in the rental account to refer to the payment of the mortgage. Further, it was her practice and procedure to use the rental account as a reserve account. Quirarte said Ryckman never demanded of her that the Firm pay him rent using monies in the rental account.

---

[5] These exhibits (123 and 124) are not included in the appellate record. We derive our description of them from the portions of the reporter's transcript where they were discussed.

4. *Property Related Expenses and Third-party Rent Payments*

Ryckman acknowledged during his testimony that between January 2002 and August 2015, he paid 50 percent of all mortgage payments and costs, including insurance payments, and that he and Drexler had an understanding that the Firm paid for the Property's operating expenses out of funds that would have otherwise been distributed to Ryckman for his compensation. He explained, "[Drexler] had my full authority to use whatever part of the money was that I was owed to pay whatever he deemed appropriate to pay." However, Ryckman disagreed that he was "responsible" for paying half of the operating expenses of the Property.

Ryckman ceased working for the Firm on August 10, 2015. Drexler and Ryckman dispute whether Ryckman left voluntarily, or Drexler fired him after learning that Ryckman was suffering from bladder cancer. Notwithstanding Ryckman's departure, Drexler maintained Ryckman was welcome to come to the Property as he pleased. Ryckman confirmed Drexler told him the building was equally his and he could come and go as he liked. Drexler never changed the locks, and Ryckman continued to store personal possessions in half of the garage. Ryckman, however, did not contribute to the management of the building.

Because Ryckman was no longer contributing to the Firm or office, Drexler thereafter expected Ryckman to continue to be responsible for half the building operating expenses, which the Firm continued to pay. At trial, the Drexlers offered over 400 pages of bills relating to the Property's operating expenses incurred between August 10, 2015 through July 21, 2021. Both Drexler and Quirarte testified that during that time period, the

11

Firm incurred $260,451.71 in operating costs, with 10 percent simple interest of $85,433.30. The Firm had also paid attorney fees for the prosecution of the partition action in the amount of $264,204.23 and there were outstanding invoices for $84,763.26. Drexler, who had hired separate counsel to represent him as to any non-partition related claims, testified that he was careful to keep costs of the partition action separate.

Ryckman called forensic accountant Marc Rosenberg as an expert.[6] Rosenberg testified generally about methods to verify bills were paid, the financial aspects of a division of a partnership, and some duties of a partnership. He did not conduct an analysis of the Property's expenses.

After Ryckman's departure, Drexler created a segregated account with an escrow company for the deposit of rent from the Property's two other tenants, pending the outcome of the litigation. At the time of trial, the account included $222,750.

5.   *Mortgage Payoff*

On or about August 20, 2015, Ryckman and Drexler met. Ryckman insisted that Drexler pay off the balance remaining on the mortgage, and on August 25, 2015, Drexler used the Firm's funds to pay off the mortgage in the amount of $250,785.06. Drexler did not make a distribution to Ryckman before or at this time, and used the Firm's money to make the payment "because it came out of the same bottom line" and was "the same profit money that would have been divided anyway." Ryckman testified that in 2014, Drexler was supposed to take money from Ryckman's share and Drexler's share of a settled case to pay off

_____

**6** The parties did not participate in an exchange of expert information under section 2034.260.

12

the mortgage. According to Ryckman, Drexler failed to do so until Ryckman insisted upon it in August 2015. Drexler therefore paid the mortgage off with money that was in the account that would have been otherwise paid to Ryckman and Drexler.

6.     *Purported Improvements to the Property*

Ryckman himself did not testify about improvements he made to the Property but did question the Drexlers about them. Drexler testified that a few years after purchasing the Property in 2002, he and Ryckman had it renovated. This included building out two offices, installing marble and tile floors and a wood stairway, erecting a brick façade, painting, roof repair, and putting in electrical and phone wiring. The Firm paid for all the materials and labor, and Drexler collaborated with Ryckman on choosing the designs and materials. Mrs. Drexler testified that following the remodel of the Property in 2002, it was "Functional. Clean. Lawyer-like space." Neither Drexler nor Mrs. Drexler agreed with Ryckman's characterization that it was a "high-end law office." Ryckman's questions indicated he believed that he was primarily responsible for the renovations, and he represented to the court that he paid for them.

Ryckman called Shemaya Mandelbaum, a licensed general contractor who had been hired to do a build out of the Property in 2002, as an expert. Mandelbaum testified he worked on the building in 2002 for a few weeks and that the Firm paid him. Ryckman sought to have Mandelbaum testify as to the amount the Property's value increased due to Ryckman's improvements. The trial court concluded Mandelbaum lacked foundation to testify on this topic and did not permit Mandelbaum to opine on this issue.

## C.    Procedural History

The procedural history of this matter is both multifaceted and protracted.  We summarize only those portions relevant to trial of the partition-related claims and the issues before us.

### 1.    *Pleadings and Relevant Pleading Challenges*

On November 2, 2015, the Drexlers filed a verified complaint against the Ryckmans for partition and recovery of half the operating expenses and mortgage payments relating to the Property.  The Drexlers alleged the parties had significant differences, making successful joint ownership of the property impossible.  The Drexlers hired an appraiser, who, in September 2015, valued the Property at approximately $1,995,000.  The complaint also prayed for one-half of the costs of the partition action, including attorney fees.  In their verified answer, the Ryckmans denied that the parties had irreconcilable differences or that partition by sale was necessary.

On March 14, 2016, the Ryckmans filed a verified cross-complaint alleging 19 causes of action, including "[w]aiver of [r]ight to [p]artition," quiet title, and causes of action for breach of contract, breach of fiduciary duty, fraud, and set off based on the parties alleged "oral joint venture/partnership agreement . . . that was partly written, partly oral, and partly implied" that the Firm would pay $10,000 per month in rent to the Ryckmans.

On or about May 18, 2016, the Drexlers filed a special motion to strike under section 425.16, arguing several of the Ryckmans' cross-claims arose from the allegations made in the Drexlers' complaint.  For example, the Ryckmans' cross-complaint alleged, " 'The [Drexlers] filing an action for [p]artition and [s]ale is in complete violation of the agreement to rent the [Property] so long as [Drexler] continues to practice law as [*sic*]

14

the [Firm] was in business or until [Drexler] and [Ryckman] were in mutual agreement.'" The trial court granted the special motion to strike as to the Ryckmans' causes of action for waiver of partition (first cause of action), breach of the covenant of good faith and fair dealing based on the Drexlers' filing of a partition action (third cause of action), quiet title relating to the Property (15th cause of action), declaratory relief relating to rights and interests in the Property (16th cause of action), and specific performance of an oral agreement concerning rent and partition of the Property (18th cause of action).

The Drexlers, who claimed to have incurred $55,910 in attorney fees on the special motion to strike, thereafter sought fees under section 425.16, subdivision (c) in the amount of $34,495.30, reduced to reflect their partial success on the motion. The trial court awarded $25,000 in attorney fees to the Drexlers.

The Ryckmans' third amended cross-complaint, filed October 6, 2017, included among other causes of action claims for breach of oral contract (concerning a joint venture or partnership to operate the office building, pay rent to the Ryckmans, and to employ Ryckman for life), partition, breach of promissory note, and unfair competition.

2. *Interrogatories and Motion in Limine*

On or about May 2, 2016, the Drexlers propounded 25 special interrogatories on Ryckman.[7] Interrogatory 6 asked whether Ryckman contended he was entitled to any credits against the Drexlers' interest in the Property. Interrogatories 8,

---

[7] Although the record indicates the Drexlers propounded the same special interrogatories on Mrs. Ryckman, neither those interrogatories nor her responses are included in the record.

9, 10, and 11 then asked, if the response to interrogatory 6 was yes, "for each such credit, state all facts that support [your] contention that [you] are entitled a credit" (interrogatory 8) and that support your contention as to the amount of the credit (interrogatory 9), and identify all documents that support entitlement to (interrogatory 10) and the amount of the credit (interrogatory 11).

On June 6, 2016, Ryckman responded, "Yes," to interrogatory 6, and stated, in response to interrogatories 8, 9, and 10, "Responding party has conducted a diligent search and has not located any documents or other things necessary to respond to this interrogatory. All documents containing the information necessary to respond to this interrogatory are located at the Law [O]ffices of David Drexler in the desk of [d]efendant Gerald Owen Ryckman, in office filling [*sic*] cabinets and in a number of storage boxes contained in the garage. Defendants suspect [p]laintiff has engaged in the spoliation of evidence by destroying or discarding the documents responsive to this request. Defendants are not able to describe the documents other than to say that they all relate to the subject building. [¶] The offsets consist of $10,000 per month in unpaid rents from the Law [O]ffices of David Drexler beginning in Jan[uary] 2002. $660,000 the reasonable value of services rendered by Gerald Owen Ryckman and approximately $750,000 in enhanced value based on Gerald Owen Ryckman design and remodeling of the building. Further the information request is subject to expert opinion. Defendants have not yet employed an expert to render opinions as to the information requested in this interrogatory." Ryckman's response to interrogatory 11 included the same statement about the documents being at the Property, and then

16

listed a number of persons who might be witnesses, including Quirarte.

On July 21, 2016, the Drexlers moved to compel further responses. The trial court conducted an informal discovery conference and urged the Ryckmans to provide further responses. On August 29, 2016, the Ryckmans, represented by counsel, served further responses. For interrogatories 8 and 9, the Ryckmans revised their answers to state, "Responding [p]arty is entitled to a credit for unpaid rent, the reasonable value of the services rendered by Gerald Owen Ryckman in the design and remolding [*sic*] of the [Property] as well as a credit for the enhancement in the value of the [Property] that resulted from the services rendered by Gerald Owen Ryckman in the design and remolding [*sic*] of the [Property]. Gerald Owen Ryckman was solely responsible for the design and remodeling of the subject property. It is Gerald Owen Ryckman's design and remodeling of the [Property] that is responsible for the enhancement in the value of the [P]roperty as well as its current value. Responding [p]arty asserts that the enhancement in the value of [the Property] is a result of Gerald Owen Ryckman's services. [¶] Discovery is continuing and ongoing. Responding [p]arty reserves the right to amend this response as additional information is learned through the discovery process."[8] Ryckman

_____

[8] In response to interrogatory 7, the Ryckmans identified the amounts for credits due to them as "$1,400,000 in unpaid rent. [¶] $600,000 for services rendered by Gerald Owen Ryckman in the design and remolding [*sic*] of the [Property]. [¶] An estimated $1,500,000 in the enhancement in the value of the [Property] as a result [of] services rendered in the design and

17

identified documents supporting his claim to credits as "Responding [p]arty's [s]tatutory [o]ffers to [c]ompromise pursuant to [section] 998[,] [o]nline marketing materials available on redfin.com, zillow.com, and loopnet.com[,] . . . equally available to [p]ropounding [p]arty. The appraisal of the [P]roperty referenced by [p]ropounding [p]arty in [p]aragraph 9 of [p]ropounding [p]arty's [a]mended [c]omplaint for [p]artition. All documents related to the revenue stream from the Property, including the [Firm] and all third party tenants. Documents/receipts and invoices as to the monies spent upgrading the subject building are in the possession of David Drexler. Responding [p]arty[ ] has made multiple requests for copies of those documents. David Drexler has refused to provide copies of those documents."[9] The record contains no support that Ryckman requested these documents in discovery, that Drexler stiff-armed any such discovery request, or that Ryckman moved

_____

remolding [*sic*] of the [Property]. The enhancement in the value of [the Property] as a result of responding party Gerald Owen Ryckman's services."

[9] On September 28, 2016, Ryckman was scheduled to appear for his noticed deposition. He claimed he was unable to give his best testimony due to "sleep deprivation." He sat for his deposition for nearly five hours the following day, but stated he needed to leave, and the Drexlers were unable to reschedule Ryckman's further deposition before the trial court heard the motion to compel. The Drexlers' counsel states, "Unable to conduct either Ryckman's or his wife's deposition[ ] before the hearing on the [m]otion to [c]ompel, [the] Drexler[s] proceeded with the hearing."

to compel for any such alleged non-compliance with discovery obligations.[10]

On October 28, 2016, the trial court ordered the Ryckmans to provide further responses and ordered them to pay monetary sanctions totaling $8,700. On November 28, 2016, Ryckman, still represented by counsel, provided further responses. Ryckman did not change his substantive answer to interrogatories 8 and 9. For interrogatories 10 and 11, Ryckman added, "The Law Offices of David Drexler is in possession, custody, or control of financial documents that would show the lump sum payments made to Ryckman for the salaries and rent owed to him from 2002 to date. Ryckman has produced all documents in his possession relating to these lump-sum payments, which consist of copies of checks. Responding [p]arty also identifies [r]esponse [*sic*] [p]arty's document production [of 441 pages]. Responding [p]arty also identified those documents in the possession, custody or control of [listing accountant firms, law firms, banks, and a tenant]."

On January 17, 2017, the Drexlers moved for issue, evidentiary, terminating and/or monetary sanctions. They argued that the Ryckmans' responses continued to be "evasive and obstructionist. [For example, t]he interrogatory asks that for each credit, Ryckman provide all facts supporting the contention that Ryckman is entitled to the credit. Yet, Ryckmna [*sic*] makes

[10] According to the case docket, the Ryckmans filed a motion to compel accompanied by a separate statement in May 2016, but it does not specify what they sought to compel. Without more, we cannot conclude this motion related in any way to the Ryckmans' purported demand that Drexler produce documents related to the Property's revenue stream or monies spent upgrading the Property.

only conclusory statements devoid of any substantive information."

On April 28, 2017, the trial court, Judge Frank J. Johnson presiding, granted evidentiary sanctions against the Ryckmans for their failure to provide satisfactory, court-ordered responses. The trial court's minute order provided, "The [c]ourt notes that [the Ryckmans] were previously . . . ordered to provide further responses to [s]pecial [i]nterrogatories . . . .  It appears that the response[s] produced pursuant to the order were the same as previously produced but without objections.  The interrogatories ask for facts.  [The Ryckmans] maintain[ ] that they have no[ ] supporting facts and all supporting material is with the [Drexlers].  [¶]  The [o]pposition is odd in that [the Ryckmans'] assertion that all facts are with the [Drexlers] implies that [the Ryckmans] have no facts or evidence to support their position. [¶]  The [c]ourt hears further argument.  The [c]ourt tries to impress upon the [Ryckmans] that the [Drexlers] will not prove their case for them.  [The Ryckmans] still insist that they have no recollection or records to support their position.  However, if there are no facts the proper response is to document efforts to comply and why compliance is not possible.  [The Ryckmans] did not do this and are technically in violation of the discovery order. [The Ryckmans] must provide facts to support their position, not allegations.  [¶]  The [c]ourt will not award terminating sanctions, but will grant what amount to evidentiary sanctions. As to the 11 special interrogatories, [the Ryckmans] are bound by the responses provided.  Practically, this means that, at least as to the 11 special interrogatories above, that [the Ryckmans] are bound by the position that they have no evidence or supporting facts.  [The Ryckmans] will not be permitted to 'find' evidence for

20

trial at a later date.  [¶]  Counsel for the moving party is to prepare and submit an[ ] order for the [c]ourt's signature."  The record does not include a transcript of the April 28, 2017 hearing.

On May 25 and 26, 2017, the trial court entered the sanctions orders prepared by the Drexlers.  The orders prohibited the Ryckmans from introducing evidence at trial beyond what was contained in their discovery responses, including "further facts or documents" that the Ryckmans were "owed or entitled to any rents or profits produced by the Property" (the rents and profits provision).

Nearly two years later, on March 22, 2019, the Ryckmans filed a motion to strike the rents and profits provision of the sanctions orders.  They claimed the trial court's minute order following the April 28, 2017, hearing did not state they could not present evidence of rents or profits due to them, that none of the 11 interrogatories related to the Ryckmans' entitlement to rents and profits, and that the Drexlers' attorney, Michael Schwimer, improperly "slipped in" reference to such rents or profits into the sanctions orders.

On April 16, 2019, Judge Johnson issued a minute order observing the trial court "fully considered the arguments of all parties, both written and oral, as well as the evidence presented," and denied the Ryckmans' motion to strike.  A transcript of this hearing is not included in the record.

On August 14, 2019, the Drexlers filed a motion in limine to preclude evidence at trial pursuant to the sanctions orders.  In opposition, the Ryckmans argued, inter alia, that Schwimer had "forged" the sanctions orders.  Further, "financial documents that show the lump sum payments made to Ryckman for the salaries and rents owed to him from 2002 to date" were in Drexler's

21

possession and control. Ryckman had "produced all documents in his possession relating to lump-sum payments, which consist of copies of checks."

On June 18, 2021, the trial court heard the Drexlers' motion in limine. Following argument, the trial court granted the Drexlers' motion. It found "the May 25, 2017 and May 26, 2017 orders are valid and will be enforced. This [c]ourt has looked at the court records and the orders were signed and entered properly and they remain in effect. They are valid court orders and there does not appear to be any impropriety by counsel." However, the trial court observed "there were some limited responses to the 11 special interrogatories," thus, it was "incumbent upon the [Ryckmans] to establish in a pleading that each witness and piece of evidence referenced in the status report is not barred by the May 2017 orders. [¶] . . . [¶] Failure to do that will mean that the evidence described in the status report will be barred under the [c]ourt's ruling on" the motion in limine.

On July 28, 2021, the trial court noted the Ryckmans did not advise the court of witnesses and evidence they believed were admissible notwithstanding the trial court's grant of the motion in limine. The court denied the Drexlers' motion to strike the Ryckmans' witnesses and evidence but stated the Drexlers could object at trial to any evidence they believed was barred by the motion in limine ruling.

3. *Trial*

On July 11, 2019, the trial court granted the Ryckmans' motion to bifurcate trial of the partition claims from a jury trial on the parties' remaining claims for damages.

On August 10, 2021, the parties began a bench trial of the partition claims. That afternoon, the trial court ordered the

22

parties to provide briefs the following day relating to the Drexlers' request for attorney fees recoverable as costs for the partition action. Copies of these briefs are not included in the appellate record.

During trial, the Drexlers called Drexler and Quirarte as witnesses. The Ryckmans both testified, and called as further witnesses the Drexlers, Rosenberg, and Mandelbaum. The witnesses' relevant testimony is summarized above. Both parties also offered exhibits in support of their respective positions; the majority of these exhibits are not included in the appellate record.

During his closing argument, Ryckman addressed the issue of rent. The court responded, "That's sure a mess. You guys have messy evidence there. You have an agreement of some sort that you would simply take the . . . money as it came in, figure out the expenses and come up with a figure that is going to be equal that you each would be happy with. . . . I have a hard time coming to the conclusion that you folks agreed that the . . . Firm would pay $20,000 a month, thereby entitling you to [$]10,000. There is some evidence of some checks. There is something written on something that says rent. But that's inconsistent with the history of how this went on for a period of time[;] . . . what you disclosed as rent on your tax return[;] . . . that is maybe how you considered it. But I'm not sure that's how this business relationship that you had with Mr. Drexler would consider it. . . . I'm having trouble finding that evidence of an agreement as to an amount certain; to wit, $20,000 a month. That sounds like a lot of rent for this building."

Ryckman argued that "every time [he] brought up rent, [he] was precluded from going into it because of [the sanctions

23

orders].”  The court responded that Ryckman should have produced discovery supporting that he was owed rent in a timely fashion.  Further, the court observed that notwithstanding the sanctions orders, it twice offered Ryckman the opportunity to proffer additional evidence on this topic (which Ryckman declined to do), and notwithstanding the motion in limine order permitted the Ryckmans to introduce evidence that they did not produce in discovery.

Ryckman also argued the attorney fees were unreasonable because the litigation went on for six years, longer than it should have.  The trial court responded that Ryckman was “a very difficult litigant” who “ran the costs up.”  The court nevertheless asked the Drexlers to justify the amount of fees, noting “they seem high.”  The Drexlers explained the Ryckmans had filed three cross-complaints (each of which included one or more causes of action that touched on issues raised in the partition action), two complaints in separate actions, at least two writ petitions that dealt directly with the partition action, and several motions to attack the sanctions orders.  The court acknowledged it thought the fees were a “little high,” but “understanding the litigious nature of this, I can understand it and I will award the fees.”

The trial court provided a detailed oral ruling and ordered the Drexlers to prepare a judgment.  In sum, the trial court found the parties were entitled to the remedy of partition and that partition by sale of the Property was more equitable than physical division.  It found the Drexler family trust and the Ryckman family trust were each 50 percent owners of the Property and that there had been a de facto partnership between Drexler and Ryckman.  It ruled the Drexlers and the Ryckmans

24

were each responsible to pay half of the Property's operating expenses from August 10, 2015 through July 21, 2021, which totaled $345,805.01, as well as half the costs of the partition action, including attorney fees which totaled $348,966.59; the court further awarded prejudgment interest on these amounts. The court denied the Drexlers' claim that they were entitled to credit for half the payoff amount of the mortgage, which totaled $250,783.06, noting it was "clear that that mortgage was paid out shortly after Mr. Ryckman left the business relationship with Mr. Drexler . . . [from] a fund which had been used, in large part, by both parties to pay each other for any—since at least 2002. . . . Mr. Ryckman would have received that money as a part of a distribution. So therefore, he has [already] paid his portion of the mortgage."

As to the third-party rents since August 10, 2015, totaling $222,750, the court ruled they should be split equally between the Drexlers and Ryckmans. The court concluded "the evidence is sorely lacking as to the agreement for $20,000 a month [in rent from the Firm to Ryckman and Drexler], thereby entitling Mr. Ryckman to $10,000 a month." Thus, it did not award any such rent to the Ryckmans. The trial court granted the Drexlers' request that the proposed judgment include the court's findings of fact and conclusions of law.

On August 23, 2021, the Drexlers lodged a proposed judgment with the trial court. On September 2, 2021, the Ryckmans filed written objections to the findings of fact and conclusions of law contained in the judgment, arguing many did not reflect what the trial court stated on the record; the Ryckmans also filed a counter proposed judgment. On September 3, 2021, the Drexlers responded to the Ryckmans'

objections and counter proposed judgment.  On September 17, 2021, the trial court issued a minute order and executed the judgment.  The Ryckmans filed an objection and request to strike the judgment.  The trial court entered judgment on September 21, 2021.[11]

The Ryckmans timely appealed.

## DISCUSSION

The 50/50 ownership of the Property itself and its partition by sale are not disputed on appeal.  The Ryckmans instead challenge the trial court's finding that the Firm did not owe them rent (including the court's exclusion of evidence under the motion in limine), and the court's order that the Ryckmans were responsible for one-half each of the Property's operating expenses and the attorney fees incurred in connection with partition.  The Ryckmans also appeal the court's award of attorney fees on the anti-SLAPP motion filed by the Drexlers, and certain language included in the judgment.

## A.    The Trial Court Did Not Abuse Its Discretion in Excluding Evidence Relating to Rents and Profits Allegedly Owed to the Ryckmans

"Discovery sanctions must be tailored in order to remedy the offending party's discovery abuse, should not give the aggrieved party more than what it is entitled to, and should not be used to punish the offending party.  We review the trial court's order under the deferential abuse of discretion standard."

---

[11] Neither the Drexlers' response, the court's minute order, nor the Ryckmans' motion to strike the judgment is included in the record.

26

(*Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1217.) " ' "An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice." ' [Citation.] ' "We presume that the court properly applied the law and acted within its discretion unless [appellants] affirmatively show[ ] otherwise." ' [Citation.]" (*Friends of Oceano Dunes v. California Coastal Commission* (2023) 90 Cal.App.5th 836, 847.) "Although these disputed rulings were issued in the context of interpreting a discovery sanction, they were still rulings to exclude evidence. In order to obtain a reversal based on the erroneous exclusion of evidence, [the Ryckmans] must show that a different result was probable if the evidence had been admitted." (*Karlsson*, *supra*, at p. 1223; see also Evid. Code, § 354.)

The Ryckmans argue the sanctions orders are void because Schwimer purportedly "forged" into them a rents and profits provision that was not part of Judge Johnson's ruling. They claim none of the interrogatories related in any way to the Ryckmans' entitlement to rents, profits produced by the Property, or improvements to the Property. This argument is without merit.

Notwithstanding the Ryckmans' current claim to the contrary, it is clear the interrogatories at issue encompassed— and the Ryckmans contemporaneously understood these interrogatories to encompass—the Ryckmans' entitlement to rents as well as profits in the form of the alleged increased value of the Property. Interrogatory 6 asked the Ryckmans whether they contended they were entitled to any credits against the Drexlers' interest in the Property. The Ryckmans responded yes,

27

and in answering interrogatories 8, 9, and 10, which asked for all facts and documents supporting this contention, explained they were due "$10,000 per month in unpaid rents from the [Firm] beginning in Jan[uary] 2002. $660,000 the reasonable value of services rendered by . . . Ryckman and approximately $750,000 in enhanced value based on . . . Ryckman['s] design and remodeling of the [Property]."

We have no transcript of the hearing on the discovery motion that resulted in the evidentiary sanctions, and nothing otherwise in the record shows the Drexlers' counsel exceeded the intended order of the trial court when he prepared the sanctions orders. That the trial court did not expressly state the subject matter of specific interrogatories in its minute order is inconsequential. (*Herrscher v. Herrscher* (1953) 41 Cal.2d 300, 304 ["It is a matter of trial court procedure whether the court chooses to make its final decision by the entry in the minutes of an order without a direction that a written order be prepared, signed and filed, or elects to enter a direction that a formal order be prepared"].) The trial court not only signed the sanctions orders that included the rents and profits provision (evincing that it was part of the court's order), but when the Ryckmans' grievance about the scope of the orders was called to the attention of the judicial officer who made the ruling, that judicial officer denied the Ryckmans' request to strike the rents and profits provision from the orders after briefing and argument— indicating that provision was in fact properly part of the court's order.

At bottom, the evidentiary sanctions and related motion in limine order did nothing more than preclude the Ryckmans from presenting evidence of rents and profits beyond what they stated

28

in their discovery responses. Such enforcement of the discovery statutes is proper and not an abuse of discretion. "The discovery statutes were intended to curtail surprises, enable each side to learn as much as possible about the strengths and weaknesses of its case, and thereby facilitate realistic settlements and efficient trials." (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 543, fn. 3, italics omitted.) Thus, under section 2023.010, a court may find a party who fails to respond to discovery, provides evasive responses, or disobeys a court order to provide discovery responses has engaged to discovery misuse. (*Id.*, subds. (d), (f), (g).) "If a party then fails to obey an order compelling further response to interrogatories, the court may make those orders that are just, including the imposition of an issue sanction, an evidence sanction, or a terminating sanction." (§ 2030.300, subd. (e).)

Here, the interrogatories asked the Ryckmans to state "all facts" supporting their entitlement to credits against the Drexlers' interest in the Property and identify "all documents" related thereto. Yet, after several months, an informal discovery conference, an order compelling them to do so as well as monetary sanctions, the Ryckmans did not provide additional facts supporting their conclusory assertion that the Firm owed them rent or that they were entitled to money related to the enhanced value of the Property. Rather, the Ryckmans insisted they had no additional "recollection or records" to support their contentions.[12] The trial court acted well within its discretion in

---

[12] Considerable evidence indicates Ryckman's statements were not accurate. It is undisputed that Ryckman continued to have access to the Property; that responsive documents were

29

ruling that the Ryckmans could not later "find" evidence and were bound by their discovery responses, including their responses to interrogatories 8, 9, 10, and 11.

What happened later was exactly what the discovery statutes are designed to prevent. The Ryckmans showed up to trial with documents they should have provided in discovery and sought to spring them on the Drexlers and Quirarte. Even so, the trial court did not obdurately enforce the motion in limine. Notwithstanding the language of the motion in limine order and the Drexlers' objections at trial, the trial court allowed the Ryckmans to elicit any testimony they wanted on the issue of

stored there (in Ryckman's own desk, among other places), without more, was not a sufficient explanation for his failure to locate and produce such documents. Further, the Ryckmans' original complaint (which predated the interrogatories), Ryckman's testimony at trial, and certain documents that he introduced at trial all show that Ryckman did in fact know of further facts and possessed documents supporting his claim that the Firm owed him rent despite his discovery responses claiming he had nothing further to provide. For example, Ryckman testified at trial that he and Drexler entered into a joint venture or partnership in which they agreed to purchase the Property and that as part of this arrangement, the Firm would pay him and Drexler rent in the amount of $20,000 per month, split equally, until Drexler ceased doing business as the Firm or they agreed to sell the Property. According to Ryckman, the rent payments were irregular, with the Firm making lump sum catch-up payments from time to time, such that Quirarte tracked rents due to the Ryckmans and sent emails to them summarizing these amounts (exhibits 123 and 124). Ryckman did not provide any of these details or identify any of these documents in response to the interrogatories despite his knowledge of them.

rents and profits. Thus, in addition to Ryckman and Mrs. Ryckman's own testimony, Ryckman extensively questioned Quirarte, Drexler, and Mrs. Drexler on these issues.

As to Ryckman's two expert witnesses, the record indicates the trial court excluded their testimony on grounds unrelated to the motion in limine order or the evidentiary sanctions. Rosenberg acknowledged he had not conducted an analysis of the Firm's expenses, and he therefore lacked the necessary foundation to testify about the Firm's rent payments. As to Mandelbaum, Drexler objected that Mandelbaum's testimony as to the enhanced value of the Property lacked foundation. The trial court asked Ryckman to describe the relevancy of Mandelbaum's testimony and concluded Mandelbaum could not testify as to the enhanced value today given his limited general contracting work years before. Thus, the record indicates the court excluded a portion of Mandelbaum's testimony due to a lack of foundation and relevancy, and not based on prior discovery responses or the motion in limine order.[13]

With respect to documents, the trial court provided considerable leeway to the Ryckmans in using exhibits to elicit

_____

[13] Moreover, Mandelbaum testified the Firm (not Ryckman) paid him for renovations to the Property. Thus, any enhanced value to the Property would not belong to Ryckman alone but to the Ryckmans and Drexlers equally and would be quantified and distributed when the Property was sold. To the extent Ryckman challenges the court's denial of a separate award to him related to work he purportedly did to improve the Property, we find no error in the court's determination that Ryckman failed to carry his burden of proof on this issue given the contested evidence before the court. (*Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 163.)

testimony and excluded only six exhibits in whole or in part based on the motion in limine order. The excluded documents fall into two categories. First, the trial court excluded portions of two exhibits that were compilations the Ryckmans created to summarize certain underlying documents. Although the trial court excluded the portion of the exhibits purporting to summarize other documents, it admitted the underlying documents themselves: Wells Fargo Bank records and the Ryckmans' tax records. The Ryckmans cannot show prejudice from the exclusion of these summaries given that the excluded portions of the exhibits summarized other evidence that was admitted. (*Karlsson v. Ford Motor Co.*, *supra*, 140 Cal.App.4th at p. 1223; see also Evid. Code, § 354.) The second category of excluded exhibits were documents Ryckman had in his possession but never produced or described in discovery: two emails between the Ryckmans and Quirarte, gross-up calculations from 2014 prepared by the Drexlers' or Drexlers' accountant, and a collection of emails between Drexler and Ryckman (described in the record as sent in August or September 2015). Given the Ryckmans' discovery violations in failing to reference or produce these documents, the trial court did not abuse its discretion in excluding them. (See § 2030.300, subd. (e).)

The Ryckmans also suggest that but for the sanctions orders, they would have introduced other unspecified documents evidencing the Firm's obligation to pay them rent and/or related to improvements. The trial court twice asked the Ryckmans to make an offer of proof regarding these purported documents; the Ryckmans did not do so, and the record contains no such documents or descriptions of them. We cannot reverse a trial court's judgment based on the purported erroneous exclusion of

evidence unless that error resulted in a miscarriage of justice and "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354.) Thus, we cannot conclude that the trial court committed reversible error in not admitting evidence when that evidence was not made known to the trial court, nor described to us.

## B. The Trial Court Did Not Err in Finding the Ryckmans Did Not Prove the Firm Owed Them Unpaid Rent in the Amount of $10,000 Per Month

The Ryckmans' appellate briefing challenges the trial court's finding that the Ryckmans failed to prove there was an agreement that the Firm would pay monthly rent in the amount of $10,000 to Ryckman and to Drexler. We are not a second trier of fact, and we find no reversible error in the trial court's resolution of this disputed issue.

We review challenges to the sufficiency of the evidence supporting a trial court's factual findings for substantial evidence. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581.) "This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. These three pillars support the lintel: We do not reweigh the evidence." (*Ibid*.) However, "where the trier of fact has determined that the party with the burden of proof did not carry its burden and that party appeals, . . . 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' " (*Ajaxo, Inc. v. E*Trade Financial Corp.*, *supra*, 48 Cal.App.5th at p. 163.) We

33

presume the judgment or order to be correct, and it is appellants' burden to overcome this presumption.  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.)

The Ryckmans adduced evidence at trial that the Firm agreed to pay them rent.  Ryckman so testified, and introduced documentary evidence that he received one $100,000 check with a notation stating "rent" and that he filed tax returns reporting money he asserted was received as rent payments.  Ryckman further introduced bank records showing a total of three online transfers into the Firm's rental account in amounts of $5,000 or $10,000 "for rental."

But contrary evidence was also introduced.  Drexler testified there was no such agreement and explained that Ryckman requested that the $100,000 check indicate it was for rent for tax purposes even though it was not.  Ryckman contends the trial court should not have believed Drexler, but we may not second-guess the trial court's credibility determinations. (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 738-739.) Moreover, other evidence supported Drexler's position.  The three online transfers identified by Ryckman were sporadic and not consistent with a monthly rent obligation of $20,000; furthermore, the Ryckmans never demonstrated that any portion of these funds were provided to them as rent.  Moreover, Quirarte, who made the transfers, appeared to use the phrases "rent" and "mortgage" interchangeably.  Nor was there any documentary evidence that Ryckman demanded payment for alleged rent—despite a significant arrearage of what he claimed was owed—until after he stopped working with Drexler.  Finally, as the trial court observed, a purported monthly rent payment of $20,000 appeared above-market for the building.

Given the contradictory evidence in the record concerning whether there was an agreement for the Firm to pay rent to the parties, we cannot say the trial court erred in finding the Ryckmans failed to carry their burden of proof to establish such an agreement. Given the disputed facts in the record, we cannot conclude that " 'the evidence compels a finding in favor of the [Ryckmans] as a matter of law.' " (*Ajaxo, Inc. v. E\*Trade Financial Corp.*, *supra*, 48 Cal.App.5th at p. 163.)

## C. The Trial Court Did Not Err in Finding the Ryckmans Owed Half the Operating Costs of the Property Since August 10, 2015

As noted above, partition actions include a final accounting according to the principles of equity, including credits for a party's expenditures in excess of their fractional share for repairs, improvements, "for the common benefit, and protection and preservation of title." (*Wallace v. Daley, supra*, 220 Cal.App.3d at p. 1036; see § 872.140.) The Drexlers presented evidence of operating costs amounting to $260,451.71 following Ryckman's departure from the Firm, with prejudgment interest of $85,433.30, for a total of $345,805.01. The judgment awarded the Drexlers a lien against the Property for $172,902.50 (half of $345,805) for the Ryckmans' unpaid share of those operating expenses.

The Ryckmans first argue the Drexlers incurred these costs only because they did not accept the Ryckmans' settlement offers, and the trial court erred in excluding evidence of the Ryckmans' settlement communications at trial. We find no such error. Evidence Code section 1154 precludes the admission of settlement offers to prove the invalidity of any claim, and thus barred the Ryckmans from offering their settlement

communications to prove the Drexlers were not entitled to operating costs. (Evid. Code, § 1154 ["Evidence that a person has accepted or offered or promised to accept a sum of money or any other thing, act, or service in satisfaction of a claim, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove the invalidity of the claim or any part of it"]; *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1475 [Evid. Code, § 1154 is "based on the public policy in favor of the settlement of disputes without litigation and [is] intended to promote candor in settlement negotiations"].)

The Ryckmans further argue the award of operating costs violated their due process rights because they had "no say" as to "what expenses would be incurred or which bills would or would not be paid." The Ryckmans could have challenged at trial any expenses they considered unreasonable, but they did not. The Drexlers provided as exhibits over 400 pages of bills relating to the Property's operating expenses incurred between August 10, 2015 through July 21, 2021, and the Ryckmans did not identify a single expense as unreasonable or unnecessary. To the contrary, when the trial court asked Ryckman whether he agreed to splitting costs 50-50, Ryckman responded, yes.

Further, the trial court's award of operating costs was equitable. The Property undoubtedly had operating costs—taxes, insurance, maintenance, and the like. Throughout their business relationship, Ryckman indirectly paid half of the Property's operating costs when Drexler deducted expenses (with Ryckman's permission) before they split the remaining funds. Indeed, Ryckman expected to be treated and was treated as a de facto partner, including receiving half the rent from third party tenants both before and, pursuant to the trial court's ruling, after

36

August 10, 2015.  Moreover, Ryckman acknowledged that he continued to have access to the building and to use it for storage even after August 10, 2015.  The Ryckmans were entitled to half the Property, and that appropriately included responsibility for half of its operating costs.

The Ryckmans also claim we should vacate the trial court's award of prejudgment interest on the operating expenses.  Parties are entitled to prejudgment interest on damages that are "certain, or capable of being made certain by calculation."  (Civ. Code, § 3287, subd. (a).)  The operating expenses were certain specified amounts, and subject to prejudgment interest.  The Ryckmans do not explain why they should not be liable for prejudgment interest, nor did they include with the appellate record any of the documentary evidence presented at trial relating to the prejudgment interest.[14]  Thus, the Ryckmans have not demonstrated any error in the trial court's ruling that they pay half the operating costs or prejudgment interest thereupon.

## D.    The Trial Court Did Not Err in Finding the Ryckmans Liable for Half the Attorney Fees Incurred in the Partition Action

Section 874.040 states, "Except as otherwise provided in this article, the court shall apportion the costs of partition among the parties in proportion to their interests or make such other

---

[14] The trial transcript indicates that in addition to the over 400 pages of bills, the Drexlers submitted exhibit 25, which summarized operating cost totals.  As Drexler testified concerning the prejudgment interest on operating costs, the trial court stated, "Mr. Ryckman, you have the figures and can check the math yourself."

apportionment as may be equitable." Such costs include "[r]easonable attorney's fees incurred or paid by a party for the common benefit." (§ 874.010, subd. (a).) "[T]he 'common benefit' in a partition action is the proper distribution of the ' "respective shares and interests in said property by the ultimate judgment of the court." ' [Citation.] This sometimes will require that ' "controversies" ' be ' "litigated" ' to correctly determine those shares and interests [citation], but this ultimately can be for the common benefit as well." (*Orien v. Lutz* (2017) 16 Cal.App.5th 957, 967.)

We review awards of attorney fees and costs for abuse of discretion. (*Finney v. Gomez* (2003) 111 Cal.App.4th 527, 545.) Because "[t]he 'experienced trial judge is the best judge of the value of professional services rendered in his court,' " the trial court has substantial discretion in calculating the amount of attorney fees, and its decision in this regard " 'will not be disturbed unless the appellate court is convinced that it is clearly wrong.' " (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49.)

The Ryckmans contend the trial court erred in awarding the Drexlers a lien on the Property for $174,483.29, half the amount of attorney fees the Drexlers incurred in the partition action. The Ryckmans first argue we should vacate the award because the Drexlers failed to file a memorandum of costs. The Ryckmans cite no authority requiring a memorandum of costs for a section 874.040 fee award, and nothing in the statute sets forth such a requirement. Instead, section 874.040 states only that the court "shall" apportion the costs and fees of partition "among the parties in proportion to their interests or make such other apportionment as may be equitable." (§ 874.040.) We accordingly decline to read into the statute a requirement it does

38

not contain.  (See *Harvey v. Stafford* (1930) 106 Cal.App. 307, 309 [holding memorandum of costs is not required under earlier version of § 874.040, former § 796, which stated, "[t]he costs of partition, including reasonable counsel fees, expended by the plaintiff or either of the defendants, for the common benefit, fees of referees, and other disbursements, must be paid by the parties respectively entitled to share in the lands divided, in proportion to their respective interests therein"].)

The Ryckmans next argue that they were not provided with an opportunity to challenge the reasonableness of the fees.  The record demonstrates that they were.  The Drexlers provided their attorney's invoices as exhibits in advance of trial.  On August 10, 2021, the trial court requested briefing relating to the Drexlers' request for fees, providing the Drexlers with another opportunity to raise concerns relating to the reasonableness of the fees.  At the close of trial, on August 13, 2021, both the Drexlers and Ryckmans presented arguments relating to the fees, including the reasonableness of the total amount.  Ultimately, the trial court concluded the amount of fees was reasonable because the Ryckmans' litigiousness "ran the costs up."  The Ryckmans' appellate briefing does not question any particular task(s) or billing rate(s).  Nor are the attorney invoices that were before the trial court included in the appellate record.  We therefore have no grounds to question any particular entries in those billing records.  "A trial court's attorney fee award will not be set aside 'absent a showing that it is manifestly excessive in the circumstances.' " (*Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1375.)  Given the circumstances of this matter, we cannot conclude that $348,966.58 in fees over a six-year period involving extensive litigation is manifestly excessive.

Instead of disputing any portion of the fees, the Ryckmans argue the court should have awarded no fees at all because the matter could have been settled early in the litigation if the Drexlers had accepted any of the Ryckmans' settlement offers, including one which they claim was made pursuant to section 998.[15]  They also argue the trial court erred in excluding evidence of their settlement offers.  In support of their argument, the Ryckmans cite two cases:  *Meister v. Regents of University of California* (1998) 67 Cal.App.4th 437 and *Marek v. Chesny* (1985) 473 U.S. 1 [105 S.Ct. 3012, 87 L.Ed.2d 1].

In *Meister v. Regents of University of California, supra*, 67 Cal.App.4th 437, the Sixth District held that a trial court had discretion to reduce an attorney fees award to a prevailing plaintiff by the amount of fees the plaintiff incurred after the plaintiff declined an *informal* (non-section 998) settlement offer for an amount greater than that recovered at trial, relying on the policy underlying section 998.  (*Meister*, *supra*, at p. 452.)  In *Greene v. Dillingham Construction N.A., Inc.* (2002) 101 Cal.App.4th 418, however, Division Four of the First District held that section 998's cost shifting provision has no application to an

---

[15] A section 998 offer to compromise must include "a statement of the offer, containing the terms and conditions of the judgment or award, and a provision that allows the accepting party to indicate acceptance of the offer by signing a statement that the offer is accepted."  (*Id.*, subd. (b).)  Section 998 also includes cost-shifting provisions, including that "[i]f an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer."  (*Id.*, subd. (c)(1).)

informal settlement offer where the offeree recovered less at trial. *Greene* disagreed with *Meister* that an informal settlement offer could be used as a factor in determining the reasonableness of attorney fees. *Greene* reasoned in part that *Meister* ignored the procedural protections afforded by section 998, including that "[a]n offer pursuant to section 998 may not be withdrawn prior to trial or within 30 days after the offer is made, whichever occurs first." (*Greene*, *supra*, at p. 425.) We agree with the reasoning of *Greene* and decline to apply *Meister* here. *Marek v. Chesny*, *supra*, 473 U.S. 1 concerns a settlement offer made pursuant to Federal Rules of Civil Procedure, rule 68, the federal analog to section 998. Thus, it has no application to the Ryckmans' informal settlement offers.

Turning to section 998 itself, the Ryckmans do not cite any authority that attorney fees in a partition action are recoverable as costs under section 998. Assuming for the sake of argument that section 998 applies to such attorney fees, the Ryckmans did not advise the court that any of their settlement communications were made pursuant to section 998. They have thus forfeited any argument that the court should have considered such a statutory offer to compromise in determining the reasonableness of the Drexlers' attorney fee request. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.4th 657, 700.) Further, the one settlement communication the Ryckmans now identify as a section 998 offer, dated February 5, 2016, does not state it is a section 998 offer, the first page of the offer is missing from the record, and the portion provided does not state anything about the Ryckmans' position on partition of the Property or the Drexlers' claim for operating costs. Rather, it indicates only that the Ryckmans proposed waiving their claims for past rent, the

41

value of renovation enhancements, and all other claims for fraud or punitive damages relating to the purchase, ownership, and operation of the Property. Thus, the communication is of limited usefulness in determining the reasonableness of fees relating to the partition action. Moreover, because no one provided the valuation of the Property at the time of judgment, the court could not have estimated whether the Drexlers truly failed to obtain a more favorable judgment. Accordingly, we conclude the trial court did not err in excluding evidence of the Ryckmans' settlement communications and in ordering the Ryckmans pay half the attorney fees incurred in the partition action.

Finally, the Ryckmans argue the trial court erred in awarding prejudgment interest on the attorney fees. As noted above, parties are entitled to prejudgment interest on damages that are "certain." (Civ. Code, § 3287, subd. (a).) This includes legal fees because those amounts become certain when billed and/or paid. (See, e.g., *Government Employees Ins. Co. v. Nadkarni* (N.D.Cal. 2020) 477 F.Supp.3d 1091, 1097.) Other than the arguments already made about the fees generally, the Ryckmans have not set forth why the Drexlers should not be entitled to such prejudgment interest. In arguing against prejudgment interest, the Ryckmans' reply brief also cites to Civil Code section 3291 and cases interpreting that statute. That section is inapposite as it applies to section 998 offers in personal injury actions; as noted above, this was a partition action (not a personal injury/tort case) in which the record does not evidence any section 998 offer. Accordingly, we find no error.

42

**E.    The Trial Court Did Not Err in Awarding Attorney Fees of $25,000 Under Section 425.16, Subdivision (c)**

The Ryckmans contend the trial court's award of attorney fees in the amount of $25,000 pursuant to section 425.16, subdivision (c) was unreasonable.[16]  They note the Drexlers brought the motion to strike as to all 19 causes of action in the cross-complaint, but that they prevailed in striking only five claims.  The trial court struck causes of action for waiver of partition, breach of the covenant of good faith and fair dealing based on the Drexlers' filing of a partition action, quiet title relating to the Property, declaratory relief relating to rights and

---

[16] The Ryckmans also challenge the trial court's ruling on the merits of the Drexlers' special motion to strike.  However, the trial court granted the special motion to strike on June 15, 2016, and thus the time for appellate review of the trial court's anti-SLAPP ruling has expired.  (See *Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1246-1247.)  In contrast, a movant under section 425.16 who does not seek attorney fees simultaneously with his or her special motion to strike must wait until judgment before seeking appellate review of an attorney fee award under section 425.16, subdivision (c).  (See *Doe v. Luster* (2006) 145 Cal.App.4th 139, 150.)  Although the parties' non-partition claims are not final or before us on this appeal, the trial court rendered judgment on the bifurcated partition claims and all of the Ryckmans' cross-claims stricken under section 425.16 relate to the Property, the partition action, and any credits due as part of the partition action.  Further, the Drexlers do not contend the Ryckmans' appeal relating to the section 425.16, subdivision (c) fees is premature.  Thus, we conclude the appeal concerning the section 425.16, subdivision (c) attorney fees is timely and properly before us.

interests in the Property, and specific performance of an oral agreement concerning rent and partition of the Property.

Section 425.16, subdivision (c) states in relevant part, "a prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and costs." (§ 425.16, subd. (c)(1).) "The purpose of the statute is to 'compensate[e] the prevailing defendant for the undue burden of defending against litigation designed to chill the exercise of free speech and petition rights. [Citation.]' [Citation.]" (*Maleti v. Wickers* (2022) 82 Cal.App.5th 181, 232.) "The term ' "prevailing defendant," ' as used in section 425.16, subdivision (c)(1), is not defined, and it is unstated whether a defendant who prevails on some, but not all, of the claims challenged in his or her anti-SLAPP motion is entitled to fees and costs. [Citation.] But as a general rule, a defendant who prevails in part in bringing a special motion to strike is entitled to fees and costs, subject to the trial court's determination of the appropriate amount awardable based upon the defendant's partial success. [Citations.] The entitlement to fees and costs where the defendant prevails in part, however, is not absolute. As explained by the court in *Mann* [*v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328,] at page 340, 'a party who partially prevails on an anti-SLAPP motion must generally be considered a prevailing party unless the results of the motion were so insignificant that the party did not achieve any practical benefit from bringing the motion.' The trial court's determination of whether a defendant prevailed such that he or she is entitled to fees and costs is reviewed for abuse of discretion. [Citation.]" (*Ibid.*)

The Ryckmans' original cross-complaint included numerous claims. The Drexlers' motion to strike meaningfully narrowed

44

what was at issue, as well as the time and resources otherwise necessary to address the claims struck for lack of merit. For example, the cause of action for quiet title alleged the Drexlers owned no interest in the Property and that their title to the Property was "fraudulent" because only the Ryckmans' monies were used (again, fraudulently) to pay the mortgage and building expenses. By the time of the trial court's ruling on the anti-SLAPP motion, however, the trial court reported, "Ryckman admits he and Drexler purchased and owned the [Property]." Thus, the anti-SLAPP motion relieved the parties from having to prove and defend against several claims, including allegations of fraud. Thus, the Drexlers did achieve a practical benefit as a result of the motion entitling them to an award of attorney fees. (See *Maleti v. Wickers*, *supra*, 82 Cal.App.5th at p. 232.)

Nor can we conclude that $25,000 is an unreasonable fee award. The Drexlers incurred $55,910 in attorney fees on the special motion to strike. They sought fees in the amount of $34,495.30 reduced to reflect their partial success on the motion. The trial court reduced the amount still further, awarding $25,000. The Ryckmans fail to explain why this reduced fee award did not properly account for the anti-SLAPP motion being granted in part, saying only that they "reasonably (mistakenly) believed" the struck causes of action were proper, and that they should not be penalized for "a pleading error." There is, however, no good faith exception to the anti-SLAPP law or its fees provision. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67-68, fn. omitted [immaterial that party whose claims are struck "had pure intentions when suing"; the anti-SLAPP statute contains "no additional requirement of proving [a

party]'s subjective intent"].) We accordingly find no error in the anti-SLAPP fee award.

## F. The Trial Court's Judgment Contains Factual Determinations Not Made by the Trial Court

Following trial, the Drexlers prepared a draft judgment for the trial court, which the trial court executed and entered. The Ryckmans contend the judgment contains "[e]xtraneous unproven statements," "which could be used by the Drexlers (as proven facts) against the Ryckmans in separate proceedings." The Ryckmans do not provide any argument in their appellate briefs as to this issue, but instead cite to their objections filed with the trial court and provided in the record. Having reviewed the 15 objections, we conclude that the majority of the objections have no merit or that no prejudice arises therefrom. For example, the Ryckmans claim the judgment does not apply to the Ryckmans' cross-complaint for partition. Yet, it is clear the resolution of the Drexlers' cause of action for partition conclusively resolved the Ryckmans' cause of action for partition.

However, we do find merit to the Ryckmans' two objections concerning Ryckman's departure from the de facto partnership. In particular, the judgment states at page 2, lines 14 to 15 that "Ryckman chose to leave the de facto partnership" and at line 16 that "Mr. Ryckman's voluntary departure from the de facto partnership on August 10, 2015 did not divest . . . ." The court found Drexler and Ryckman "operated the Property together until 2015, when Mr. Ryckman, for reasons that are still unknown, left the business relationship." In other words, the trial court did not determine whether Ryckman's departure was voluntary or not. Because the cause of Ryckmans' departure may be relevant to his claim for wrongful termination (the resolution

46

of which may not yet be final), these statements should be corrected.  Accordingly, we will remand for the limited purpose that the trial court replace the phrase "chose to leave" at page 2, lines 14 to 15 with "left" and strike the word "voluntary" from page 2, line 16.

## DISPOSITION

The trial court's judgment is affirmed and remanded with instructions to correct the judgment by replacing the phrase "chose to leave" at page 2, lines 14 to 15 with "left," and striking the word "voluntary" from page 2, line 16.  The Drexlers are awarded their costs on appeal.

NOT TO BE PUBLISHED


WEINGART, J.


We concur:


ROTHSCHILD, P. J.


BENDIX, J.


47